## FEDERAL DEPOSIT INS. CORPORATION v. MASON et al.

### No. 7347.

Circuit Court of Appeals, Third Circuit.

Nov. 13, 1940.

Albert A. Griffin, of Bradford, Pa., and Frederick A. VanDenbergh, Jr., and Allen S. Olmsted, 2d, both of Philadelphia, Pa. (James M. Kane and Francis C. Brown, both of Washington, D. C., of counsel), for plaintiff, appellant.

Albert L. Thomas, of Meadville, Pa., for Harry M. Wick and John E. Golden.

English, Quinn, Leemhuis & Tayntor and Frank B. Quinn, all of Erie, Pa., for Robert L. Mason and Willis H. Powers.

Before BIGGS, MARIS, and JONES, Circuit Judges.

MARIS, Circuit Judge.

This is an appeal by the plaintiff from an order of the District Court for the Western District of Pennsylvania dismissing its action at the close of the plaintiff's evidence on the ground that upon the facts and the law the plaintiff had shown no right to relief. The plaintiff is the receiver of the Commercial National Bank of Bradford, Pennsylvania, hereinafter called the bank. It seeks by amended bill in equity to recover from

former directors of the bank $120,000 in dividends alleged to have been unlawfully declared by the directors and to obtain an accounting for money alleged to have been lost by the bank as a result of the negligence of the directors in the management of the bank's affairs. The defendant, Willis H. Powers, was elected a director in 1904, John E. Golden in 1925, Robert L. Mason and Harry M. Wick in 1928. All served as directors until the closing of the bank in 1935. Powers and Mason were president and vice president. All four died after suit was started and their personal representatives were substituted as defendants.

The bank is a national association incorporated in 1890 with a capitalization of $100,000 which was later increased to $300,-000. The by-laws provided that the entire board of directors, which consisted of five persons, should make a careful examination of the bank four times each year, once in each quarter, and at any other times when in the judgment of the directors it was advisable. The audits actually made by the directors were perfunctory, however, and in making them the directors relied, as to the details, largely upon the assistance of officers and employees whose work was being audited.

In 1920 Carl Anderson, a bookkeeper of the bank, was found to have embezzled $22,150 for which full restitution was made. In 1931, Reed Campbell, employed as teller and bookkeeper, was discovered to be short in his accounts. In order to satisfy the surety company which had issued a fidelity bond covering Campbell that the latter's embezzlement was in excess of $25,000, the amount of the bond, the directors ordered an investigation of Campbell's accounts to be conducted in secret by a committee of four employees of the bank. It afterward appeared that two of the committee were themselves at the time engaged in embezzling funds of the bank. The investigation disclosed that Campbell had manipulated correspondent bank accounts so as to conceal defalcations amounting to $80,822.91. No effort was made by the committee or the directors to find the full extent of the Campbell shortage, which in fact was $359,-344.25 in excess of the sum reported by the committee of employees. The actual Campbell defalcations were sufficient to wipe out the profits and surplus of the bank and to impair its capital structure. No effort, however, was made by the directors to determine whether the bank's bookkeeping system was defective or to conduct a more accurate audit of its accounts.

At the close of the year in which the Campbell shortage was discovered, December 1931, and semi-annually thereafter until June, 1935, the directors declared dividends which totalled $120,000. Throughout this period the capital of the bank was seriously impaired and at the close of the period was entirely wiped out. In September, 1935 a national bank examiner discovered that the bank was short in its accounts $1,249,-000. This was approximately $800,000 more than the shortage which actually existed at the time of the discovery of the Campbell defalcation. The shortage necessitated the closing of the bank.

The major portion of the 1935 shortage was traced to Frank Calkins, assistant cashier in the loans and discount department, one of the bank employees who had previously investigated the Campbell shortage. His peculations covered a period of at least five years during which, among other fraudulent operations, he manipulated the correspondent bank account with the same system as that used by Campbell. A shortage for which S. B. Benson, another of the employees who had investigated the Campbell peculations, was responsible, was discovered in the depositors' checking accounts. In addition Harold L. Miller, receiving and paying teller and bookkeeper for the savings department, had embezzled in the savings department for a period of ten years. It was testified that an independent audit, even though partial, would have disclosed the Campbell and Calkins shortages; a complete audit would have disclosed all the peculations. There was also testimony that it is the most universal practice of national banks to have independent audits of their accounts made periodically.

The amended bill of complaint presented two issues for the determination of the district court. First: Did the directors become personally liable by the terms of the National Bank Act for the $120,000 in dividends which they declared out of capital in violation of the act? Second: Did the directors become personally liable for the $120,000 thus paid out and for other losses sustained by the bank because of failure to exercise that degree of care in the conduct of the bank's affairs which is imposed upon directors by the common law?

First, as to the statutory liability of the directors for the declaration of dividends out of capital at a time when the

bank in fact had no profits and no surplus. The National Bank Act confers upon the directors of a national bank discretion to declare dividends out of profits (R.S. § 5199, 12 U.S.C.A. § 60), but prohibits dividends to be made if losses have been sustained equal to undivided profits, or in excess of net profits on hand after deducting losses and bad debts, or payable out of capital (R.S. § 5204, 12 U.S.C.A. § 56). Personal liability is imposed upon the directors if they "knowingly" violate the Act (R.S. § 5239, 12 U.S.C.A. § 93). It is not disputed that in the present case the Act was violated by the directors when dividends were declared which could only be paid out of capital or depositors' money, since the losses sustained through the embezzlements had wiped out all the undivided profits. The question on this branch of the case is whether the evidence was sufficient to support a finding that the directors "knowingly" violated the Act. The defendants argue that although the directors knew that losses had been sustained they did not know the full amount of the losses, or that the losses exceeded the undivided profits and, therefore, did not "knowingly" violate the Act.

We do not think that the word "knowingly" is to be construed so narrowly. In Corsicana National Bank v. Johnson, 251 U.S. 68, at page 71, 40 S.Ct. 82, at page 84, 64 L.Ed. 141, where the alleged violation of the National Bank Act consisted in the granting of excessive loans, the Supreme Court said: "Under the rule settled by familiar decisions of this court, in order for the bank to prevail in this action it must appear not only that the liabilities of a person, company, firm, etc., to the bank for money borrowed were permitted to exceed the prescribed limit, but that defendant, while a director, participated in or assented to the excessive loan or loans, not through mere negligence, but knowingly and in effect intentionally (Yates v. Jones · National Bank, 206 U.S. 158, 180, 27 S.Ct. 638, 51 L.Ed. 1002), *with this qualification, that if he deliberately refrained from investigating that which it was his duty to investigate, any resulting violation of the statute must be regarded as 'in effect intentional.'* " (Emphasis supplied.) This same qualification is found in Thomas v. Taylor, 224 U.S. 73, 32 S.Ct. 403, 56 L.Ed. 673, and Jones National Bank v. Yates, 240 U.S. 541, 36 S.Ct. 429, 60 L.Ed. 788, where the directors did not know that the Act was being violated, but could have known had they

investigated. In Thomas v. Taylor, supra, the directors failed to make an examination to determine the true condition of an ·asset which the Comptroller of the Currency had stated was doubtful and permitted it to be listed in a bank statement at its face value. In Jones National Bank v. Yates, supra, the Comptroller of the Currency called the bank's attention to discrepancies in its published reports. Despite this warning the directors failed to investigate the discrepancies and permitted the publication of a new report containing the same statements. In each of these cases the court imputed knowledge to the directors because of their willful failure to take heed of the warning.

The discovery of the Campbell peculations, following the previous Anderson embezzlement, was as clear a warning to the directors of the need for a thorough and complete audit as a notice from the Comptroller of the Currency would have been. We think that the evidence produced by the plaintiff indicating that the directors deliberately refrained from utilizing available accounting methods and from employing independent auditors to determine the full extent of the loss to the bank at the time of the Campbell defalcations was sufficient to support a finding that the directors "knowingly" violated the statute.

█ Second, as to the common law liability of directors for lack of diligence in the performances of their duties. At common law, as we shall point out, as well as under the bank's by-laws, it was the duty of the directors to examine the affairs of the bank periodically. Until the discovery of the Campbell peculations the directors may have been justified in considering their examination, perfunctory as it was, all that was necessary. That event, however, made it obvious that the system followed by them had not served the purpose of revealing the true conditions which existed in the bank. The necessity of adopting a more searching and accurate auditing system was then clearly indicated. When the directors learned of the Campbell defalcations the duty was theirs to determine the full extent of the shortage, the system used by Campbell in his embezzlements and the defects, if any, in the bank's accounting system which made his breach of trust possible. Ordinary prudence should have dictated an investigation to determine whether other employees, equally trusted, had participated in Campbell's

peculations, either through active connivance or because of inefficiency.

It has long been settled that bank directors have a duty at common law to exercise ordinary care and prudence in the administration of the affairs of their bank. Briggs v. Spaulding, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662. In the case before us we think it might fairly be found from the plaintiff's evidence that the directors, if ordinarily diligent, would have reached the conclusion that their past method of superficial examination of the condition of the bank, with complete reliance upon the trustworthiness and efficiency of the bank employees, was inadequate. Ordinary prudence in view of the almost universal practice among the national banks of the country likewise should have persuaded the directors of the need of an independent audit of the bank's affairs by a competent outside accountant. Nor are we applying a hindsight test of what would amount to a proper degree of due care under the circumstances, for the directors were aware of the facts in 1931, immediately after the discovery of the Campbell shortage.

It was then obvious that the existing method of supervising the bank's affairs was inadequate and that some of the employees were dishonest or incompetent or both. Nevertheless the directors did nothing to avoid a repetition of loss to the bank and continued complacently to close their eyes to the obvious needs of their institution. It is no defense to aver that they did not know of the true state of affairs which existed in the bank when the need for investigation was so patent and the means for knowledge were so readily available. Failure to investigate the weakness in the bank's set-up and to take the necessary steps to prevent its continuance might well be found to be negligence which bore a direct relationship to the losses later sustained by the bank through the Calkins, Benson and Miller defalcations.

In Atherton v. Anderson, 6 Cir., 99 F.2d 883, in reply to the defense that the directors did not know that loans made by the bank were excessive, the court said (99 F.2d at page 889): "Ignorance under such circumstances is not an excuse. * * * It was their duty to know the facts. They had the means of knowledge literally before them and they would have known had they exercised the control and supervision over the Bank and its officers which the law requires." In Martin v. Webb, 110 U.S. 7, at page 15, 3 S.Ct. 428, at page 433, 28 L.Ed. 429, the court said: "Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers."

We think that the plaintiff's evidence was sufficient to support a finding that the directors were remiss in their duties when they failed to determine the full extent of the Campbell defalcations and failed to revise their perfunctory method of examining the condition of the bank after that method was shown to be inadequate.

This case began as a suit in equity and it was tried by a district judge without a jury. The order of dismissal here appealed from was made upon motion of the defendants immediately after the plaintiff had completed the presentation of its evidence. The motion was authorized by Civil Procedure Rule 41(b), 28 U.S.C.A. following Section 723c, which provides in part that "After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." The Advisory Committee appointed by the Supreme Court says as to this rule that "for actions tried without a jury, it provides the equivalent of the directed verdict practice for jury actions which is regulated by Rule 50." Note to Rule 41(b), 28 U.S.C.A. following section 723c. Inasmuch as an order of dismissal under Rule 41(b) is the equivalent of a directed verdict we must upon review of such an order view the evidence and all inferences reasonably to be drawn therefrom in the light most favorable to the plaintiff. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; United States v. Russian, 3 Cir., 73 F.2d 363. In our opinion the evidence, so viewed, was sufficient, if believed and not overcome by the defendants' evidence, to support findings and a judgment in favor of the plaintiff. It follows that the order dismissing the action must be reversed.

It remains to consider the procedure which should be followed in this case after it is remanded to the district court. Civil Procedure Rule 50 provides that: "A party who moves for a directed verdict at the close of the evidence offered by an op-

552

ponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made." It is thus seen that if the defendants' motion had not been granted by the district court they would have been entitled to proceed to offer evidence in their defense. Since we now hold that the order granting their motion was erroneous and must be reversed it follows that the Civil Procedure Rules require that the defendants now be afforded an opportunity to offer their evidence. We see no reason, however, in a case such as this, which was tried without a jury, to require the plaintiff to offer its evidence a second time. Accordingly we will direct the district judge who heard the plaintiff's evidence to proceed with the trial of the case as though the defendants' motion for dismissal had not been granted by him.

The order of the district court is reversed and the cause is remanded for further proceedings in conformity with this opinion.