ATHERTON *v.* FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR CITY SAVINGS, F. S. B.

No. 95–928.   Argued November 4, 1996—Decided January 14, 1997

214

*Ronald W. Stevens* argued the cause for petitioner. With him on the briefs were *Gilbert C. Miller* and *Bruce H. Nielson.*

*Richard P. Bress* argued the cause for respondent. With him on the brief were *Acting Solicitor General Dellinger, Deputy Solicitor General Bender, Jack D. Smith, Ann S. DuRoss,* and *Jerome A. Madden.*\*

JUSTICE BREYER delivered the opinion of the Court.

The Resolution Trust Corporation (RTC) sued several officers and directors of City Federal Savings Bank, claiming that they had violated the legal standard of care they owed that federally chartered, federally insured institution. The case here focuses upon the legal standard for determining whether or not their behavior was improper. It asks where courts should look to find the standard of care to measure the legal propriety of the defendants' conduct—to state law,

---

\*Briefs of *amici curiae* urging reversal were filed for the American Bankers Association et al. by *John J. Gill III, Michael F. Crotty, Richard M. Whiting,* and *Leonard J. Rubin;* for the Washington Legal Foundation et al. by *Reuben B. Robertson III, Daniel J. Popeo,* and *Paul D. Kamenar;* and for Joseph Iaria et al. by *Douglas S. Eakeley* and *Alan S. Naar.*

to federal common law, or to a special federal statute (103 Stat. 243, 12 U. S. C. §1821(k)) that speaks of "gross negligence"?

We conclude that state law sets the standard of conduct as long as the state standard (such as simple negligence) is stricter than that of the federal statute. The federal statute nonetheless sets a "gross negligence" floor, which applies as a substitute for state standards that are more relaxed.

## I

In 1989, City Federal Savings Bank (City Federal), a federal savings association, went into receivership. The RTC, as receiver, brought this action in the bank's name against officers and directors. (Throughout this opinion, we use the more colloquial term "bank" to refer to a variety of institutions such as "federal savings associations.") The complaint said that the defendants had acted (or failed to act) in ways that led City Federal to make various bad development, construction, and business acquisition loans. It claimed that these actions (or omissions) were unlawful because they amounted to gross negligence, simple negligence, and breaches of fiduciary duty.

The defendants moved to dismiss. They pointed to a federal statute, 12 U. S. C. §1821(k), that says in part that a "director or officer" of a federally insured bank "may be held personally liable for monetary damages" in an RTC-initiated "civil action . . . for *gross negligence*" or "similar conduct . . . that demonstrates a greater disregard of a duty of care (than gross negligence) . . . ." (Emphasis added.) They argued that, by authorizing actions for gross negligence or more seriously culpable conduct, the statute intended to forbid actions based upon less seriously culpable conduct, such as conduct that rose only to the level of simple negligence. The District Court agreed and dismissed all but the gross negligence claims.

The Third Circuit, providing an interlocutory appeal, 28 U. S. C. § 1292(b), reversed. It interpreted the federal statute as simply offering a safeguard against state legislation that had watered down applicable state standards of care—below a gross negligence benchmark. As so interpreted, the statute did not prohibit actions resting upon stricter standard of care rules—whether those stricter standard of care rules originated in state law (which the Circuit found applicable in the case of state-chartered banks) or in federal common law (which the Circuit found applicable in the case of federally chartered banks). *Resolution Trust Corp.* v. *Cityfed Financial Corp.*, 57 F. 3d 1231, 1243–1244, 1245–1249 (1995). Noting that City Federal is a federally chartered savings institution, the Circuit concluded that the RTC was free "to pursue any claims for negligence or breach of fiduciary duty available as a matter of federal common law." *Id.*, at 1249.

The defendants, pointing to variations in the Circuits' interpretations of the "gross negligence" statute, sought certiorari. Compare *Resolution Trust Corp.* v. *Frates*, 52 F. 3d 295 (CA10 1995) (§ 1821(k) prohibits federal common-law actions for simple negligence), with *Cityfed, supra*, at 1246–1249 (§ 1821(k) does not prohibit federal common-law actions for simple negligence). And we granted review.

## II

We begin by temporarily setting the federal "gross negligence" statute to the side, and by asking whether, were there no such statute, federal common law would provide the applicable legal standard. We recognize, as did the Third Circuit, that this Court did once articulate federal common-law corporate governance standards, applicable to federally chartered banks. *Briggs* v. *Spaulding*, 141 U. S. 132 (1891). See also *Martin* v. *Webb*, 110 U. S. 7, 15 (1884) (directors must "use ordinary diligence . . . and . . . exercise reasonable

control"); *Bowerman* v. *Hamner*, 250 U. S. 504 (1919). But the Court found its rules of decision in federal common law long before it held, in *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), that "[t]here is no federal general common law." *Id.*, at 78. The Third Circuit, while considering itself bound by *Briggs*, asked whether relevant federal common-law standards could have survived *Erie*. We conclude that they did not and that (except as modified in Part III, *infra*) state law, not federal common law, provides the applicable rules for decision.

This Court has recently discussed what one might call "federal common law" in the strictest sense, *i. e.*, a rule of decision that amounts, not simply to an interpretation of a federal statute or a properly promulgated administrative rule, but, rather, to the judicial "creation" of a special federal rule of decision. See *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 640–643 (1981). The Court has said that "cases in which judicial creation of a special federal rule would be justified . . . are . . . 'few and restricted.'" *O'Melveny & Myers* v. *FDIC*, 512 U. S. 79, 87 (1994) (quoting *Wheeldin* v. *Wheeler*, 373 U. S. 647, 651 (1963)). "Whether latent federal power should be exercised to displace state law is primarily a decision for Congress," not the federal courts. *Wallis* v. *Pan American Petroleum Corp.*, 384 U. S. 63, 68 (1966). Nor does the existence of related federal statutes automatically show that Congress intended courts to create federal common-law rules, for "'Congress acts . . . against the background of the total *corpus juris* of the states . . . .'" *Id.*, at 68 (quoting H. Hart & H. Wechsler, The Federal Courts and the Federal System 435 (1953)). Thus, normally, when courts decide to fashion rules of federal common law, "the guiding principle is that a significant conflict between some federal policy or interest and the use of state law . . . must first be specifically shown." 384 U. S., at 68. Indeed, such a "conflict" is normally a "precondition." *O'Melveny, supra,* at 87. See also *United States* v. *Kimbell*

*Foods, Inc.,* 440 U. S. 715, 728 (1979); *Kamen* v. *Kemper Financial Services, Inc.,* 500 U. S. 90, 98 (1991).

No one doubts the power of Congress to legislate rules for deciding cases like the one before us. Indeed, Congress has enacted related legislation. Certain federal statutes specify, for example, how to form "national banks" (*i. e.,* a federally chartered bank), how to amend the articles of association, how shareholders are to vote, directors' qualifications, the form of a bank's "organization certificate," minimum capital requirements, and a list of corporate powers. See 12 U. S. C. § 21 *et seq.* Other federal statutes regulate the activities of federally chartered savings associations in various ways. *E. g.,* 12 U. S. C. § 1464(b) (various regulations on savings associations, such as interest rate on loans). No one argues, however, that either these statutes, or federal regulations validly promulgated pursuant to statute, set forth general corporate governance standards of the sort at issue applicable to a federally chartered *savings* association such as City Federal. Cf. 61 Fed. Reg. 4866 (1996) (to be codified in 12 CFR § 7.2000) (discussed *infra,* at 224) (describing governance procedures applicable to federally chartered national banks, but not federal savings associations). Consequently, we must decide whether the application of state-law standards of care to such banks would conflict with, and thereby significantly threaten, a federal policy or interest.

We have examined each of the basic arguments that the respondent implicitly or explicitly raises. In our view, they do not point to a conflict or threat that is significant, and we shall explain why. (The respondent, by the way, is now the Federal Deposit Insurance Corporation—the FDIC—which has replaced the RTC pursuant to a new federal statute. 12 U. S. C. § 1441a(b)(4)(A).)

First, the FDIC invokes the need for "uniformity." Federal common law, it says, will provide uniformity, but "[s]uperimposing *state* standards of fiduciary responsibility over standards developed by a *federal* chartering authority would

. . . 'upset the balance' that the federal chartering authority 'may strike . . . .'" Brief for Respondent 23 (quoting *Kamen, supra,* at 103). To invoke the concept of "uniformity," however, is not to prove its need. Cf. *Kimbell Foods, supra,* at 730 (rejecting "generalized pleas for uniformity"); *O'Melveny, supra,* at 88 (same).

For one thing, the number of federally insured banks is about equally divided between federally chartered and state-chartered banks, Federal Deposit Insurance Corporation, 1 Statistics on Banking: A Statistical History of the United States Banking Industry, p. B–9 (Aug. 1995) (Table SI–9) (showing that, in 1989, there were 1,595 federally chartered institutions and 1,492 state-chartered ones); and a federal standard that increases uniformity among the former would increase disparity with the latter.

For another, our Nation's banking system has thrived despite disparities in matters of corporate governance. Consider, for example, the divergent state-law governance standards applicable to banks chartered in different States, *e. g.,* Ind. Code § 23–1–35–1(e)(2) (1994) (directors not liable unless conduct constitutes at least "willful misconduct or recklessness"); Iowa Code § 524.605 (1995) (providing ordinary negligence standard), as well as the different ways in which lower courts since 1891 have interpreted *Briggs'* "federal common law" standard. Compare *Federal Deposit Insurance Corporation* v. *Mason,* 115 F. 2d 548, 551–552 (CA3 1940) (applying standard similar to simple negligence), with *Washington Bancorporation* v. *Said,* 812 F. Supp. 1256, 1266 (DC 1993) (*Briggs* did not apply "simple negligence" standard of care). See R. Stevens & B. Nielson, The Standard of Care for Directors and Officers of Federally Chartered Depository Institutions: It's Gross Negligence Regardless of Whether Section 1821(k) Preempts Federal Common Law, 13 Ann. Review Banking L. 169, 172 (1994) (in part because of "widely varying results, the federal common law standard of care is neither fully developed, nor well settled"). See

also *infra*, at 223 (citing cases in which state governance law has been applied to national banks). Indeed, the Comptroller of the Currency, acting through regulation, permits considerable disparity in the standard of care applicable to federally chartered banks other than savings banks (which are under the jurisdiction of the Office of Thrift Supervision (OTS), 12 U. S. C. §§ 1462a, 1463(a)). See 61 Fed. Reg. 4866 (1996) (to be codified in 12 CFR § 7.2000) (permitting banks, within broad limits, "to follow the corporate governance procedures of the law of the state in which the main office of the bank is located . . . [or] the Delaware General Corporation Law . . . or the [Model Business Corporation Act]").

Second, the FDIC at times suggests that courts must apply a federal common-law standard of care simply because the banks in question are federally chartered. This argument, with little more, might have seemed a strong one during most of the first century of our Nation's history, for then state-chartered banks were the norm and federally chartered banks an exception—and federal banks often encountered hostility and deleterious state laws. See B. Klebaner, American Commercial Banking: *A History* 4–11 (1990) (tracing the origin of the dual banking system to the 1780 Philadelphia Bank and discussing proposals of a then-young Alexander Hamilton); B. Hammond, Banks and Politics in America: From the Revolution to the Civil War 41–66 (1957) (describing the controversial, but successful, Federalist proposals for the first and second federally chartered Bank of the United States).

After President Madison helped to create the second Bank of the United States, for example, many States enacted laws that taxed the federal bank in an effort to weaken it. This Court held those taxes unconstitutional. *McCulloch* v. *Maryland*, 4 Wheat. 316, 431 (1819) ("[T]he power to tax involves the power to destroy"). See also *Osborn* v. *Bank of United States*, 9 Wheat. 738 (1824) (federal marshals acted lawfully in seizing funds from a state tax collector who had

hurdled the counter at the Chilicothe Branch of the Bank of the United States and taken $100,000 from the vault). Still, 10 years later President Andrew Jackson effectively killed the bank. His Secretary of the Treasury Roger Taney (later Chief Justice), believing state banks fully able to serve the Nation, took steps to "ushe[r] in the era of expansive state banking." A. Pollard, J. Passaic, K. Ellis, & J. Daly, Banking Law in the United States 16 (1988). See also *Briscoe* v. *Bank of Kentucky*, 11 Pet. 257 (1837) (permitting state banks to issue paper money in certain circumstances).

During and after the Civil War a federal banking system reemerged. Moved in part by war-related financing needs, Treasury Secretary (later Chief Justice) Salmon P. Chase proposed, and Congress enacted, laws providing for federally chartered banks, Act of Feb. 20, 1863, ch. 43, 12 Stat. 655, and encouraging state banks to obtain federal charters. Act of June 3, 1864, ch. 106, 13 Stat. 99 (only federally chartered banks can issue national currency). See also *Veazie* v. *Fenno*, 8 Wall. 533 (1869) (opinion of Chase, C. J.) (upholding constitutionality of federal taxation of state banks). Just before World War I, Congress created the federal reserve system. Act of Dec. 23, 1913, ch. 6, 38 Stat. 251. After that war, it created several federal banking agencies with regulatory authority over both federal and state banks. Act of June 16, 1933, ch. 89, 48 Stat. 162. And in 1933, it provided for the federal chartering of savings banks. Act of June 13, 1933, ch. 62, 48 Stat. 128.

This latter history is relevant because in 1870 and thereafter this Court held that federally chartered banks are subject to state law. See *National Bank* v. *Commonwealth*, 9 Wall. 353, 361 (1870). In *National Bank* the Court distinguished *McCulloch* by recalling that Maryland's taxes were "used . . . to destroy," and it added that federal banks

> "are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are

governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State law. It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional." 9 Wall., at 362.

The Court subsequently found numerous state laws applicable to federally chartered banks. See, *e. g.*, *Davis* v. *Elmira Savings Bank*, 161 U. S. 275, 290 (1896) ("Nothing, of course, in this opinion is intended to deny the operation of general and undiscriminating state laws on the contracts of national banks, so long as such laws do not conflict with the letter or the general objects and purposes of Congressional legislation"); *First Nat. Bank in St. Louis* v. *Missouri*, 263 U. S. 640, 656 (1924) (national banks "are subject to the laws of a State in respect of their affairs unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies or conflict with the paramount law of the United States"); *Wichita Royalty Co.* v. *City Nat. Bank of Wichita Falls*, 306 U. S. 103 (1939) (applying state law to tort claim by depositor against directors of a national bank); *Anderson Nat. Bank* v. *Luckett*, 321 U. S. 233, 248 (1944) ("[N]ational banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions"); *California Fed. Sav. & Loan Assn.* v. *Guerra*, 479 U. S. 272 (1987) (applying state employment discrimination law to federally chartered savings and loan association).

For present purposes, the consequence is the following: To point to a federal charter by itself shows no conflict, threat, or need for "federal common law." It does not answer the critical question.

Third, the FDIC refers to a conflict of laws principle called the "internal affairs doctrine"—a doctrine that this Court has described as

> "a conflict of laws principle which recognizes that only
> one State should have the authority to regulate a cor-
> poration's internal affairs—matters peculiar to the
> relationships among or between the corporation and its
> current officers, directors, and shareholders—because
> otherwise a corporation could be faced with conflict-
> ing demands." *Edgar* v. *MITE Corp.*, 457 U. S. 624,
> 645 (1982).

States normally look to the State of a business' incorporation
for the law that provides the relevant corporate governance
general standard of care. Restatement (Second) Conflict of
Laws § 309 (1971). And by analogy, it has been argued,
courts should look to federal law to find the standard of care
governing officers and directors of federally chartered banks.
See *Resolution Trust Corporation* v. *Chapman*, 29 F. 3d
1120, 1123–1124 (CA7 1994).

To find a justification for federal common law in this argu-
ment, however, is to substitute analogy or formal symmetry
for the controlling legal requirement, namely, the existence
of a need to create federal common law arising out of a sig-
nificant conflict or threat to a federal interest. *O'Melveny*,
512 U. S., at 85, 87. The internal affairs doctrine shows no
such need, for it seeks only to avoid conflict by requiring that
there be a single point of legal reference. Nothing in that
doctrine suggests that the single source of law must be fed-
eral. See *Chapman, supra*, at 1126–1127 (Posner, C. J., dis-
senting). In the absence of a governing federal common law,
courts applying the internal affairs doctrine could find (we
do not say that they will find) that the State closest analogi-
cally to the State of incorporation of an ordinary business is
the State in which the federally chartered bank has its main
office or maintains its principal place of business. Cf. 61
Fed. Reg. 4866 (1996) (to be codified in 12 CFR § 7.2000) (fed-
erally chartered commercial banks may "follow the corporate
governance procedures of the law of the state in which the
main office of the bank is located"). So to apply state law,

as we have said, would tend to avoid disparity between federally chartered and state-chartered banks (that might be next door to each other). And, of course, if this approach proved problematic, Congress and federal agencies acting pursuant to congressionally delegated authority remain free to provide to the contrary.

Fourth, the FDIC points to statutes that provide the OTS, a federal regulatory agency, with authority to fine, or to remove from office, savings bank officers and directors for certain breaches of fiduciary duty. The FDIC adds that in "the course of such proceedings, the OTS, applying the ordinary-care standard [of *Briggs*,] . . . has spoken authoritatively respecting the duty of care owed by directors and officers to federal savings associations." Brief for Respondent 23–25 (citations omitted). The FDIC does not claim, however, that these OTS statements, interpreting a pre-existing judge-made federal common-law standard (*i. e.*, that of *Briggs*) themselves amounted to an agency effort to promulgate a binding regulation pursuant to delegated congressional authority. Nor have we found, in our examination of the relevant OTS opinions, any convincing evidence of a relevant, significant conflict or threat to a federal interest.

Finally, we note that here, as in *O'Melveny*, the FDIC is acting only as a receiver of a failed institution; it is not pursuing the interest of the Federal Government as a bank insurer—an interest likely present whether the insured institution is state, or federally, chartered.

In sum, we can find no significant conflict with, or threat to, a federal interest. The federal need is far weaker than was present in what the Court has called the "'few and restricted' instances," *Milwaukee* v. *Illinois*, 451 U. S. 304, 313 (1981), in which this Court has created a federal common law. Consider, for example, *Hinderlider* v. *La Plata River & Cherry Creek Ditch Co.*, 304 U. S. 92 (1938) (controversy between two States regarding apportionment of streamwater); *Boyle* v. *United Technologies Corp.*, 487 U. S. 500 (1988)

(Federal Government contractors and civil liability of federal officials); *United States* v. *Standard Oil Co. of Cal.*, 332 U. S. 301, 305 (1947) (relationship between Federal Government and members of its Armed Forces); *Howard* v. *Lyons*, 360 U. S. 593, 597 (1959) ( liability of federal officers in the course of official duty); *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 425 (1964) (relationships with other countries). See also *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 641 (1981) ("[A]bsent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases"). Indeed, the interests in many of the cases where this Court has declined to recognize federal common law appear at least as strong as, if not stronger than, those present here. *E. g., Wallis* v. *Pan American Petroleum Corp.*, 384 U. S. 63 (1966) (applying state law to claims for land owned and leased by the Federal Government); *Kimbell Foods*, 440 U. S., at 726, 732–738 (applying state law to priority of liens under federal lending programs).

We conclude that the federal common-law standards enunciated in cases such as *Briggs* did not survive this Court's later decision in *Erie* v. *Tompkins*. There is no federal common law that would create a general standard of care applicable to this case.

## III

We now turn to a further question: Does federal *statutory* law (namely, the federal "gross negligence" statute) supplant any state-law standard of care? The relevant parts of that statute read as follows:

> "*A director or officer* of an insured depository institution *may be held personally liable for* monetary damages in any civil action by, on behalf of, or at the request or

direction of the Corporation . . . acting as conservator or receiver . . . for *gross negligence, including* any similar conduct or conduct that demonstrates *a greater disregard of a duty of care* (than gross negligence) including intentional tortious conduct, as such terms are defined and determined under applicable State law. *Nothing in this paragraph shall impair or affect any right of the Corporation under other applicable law.*" 12 U. S. C. § 1821(k) (emphasis added).

Lower courts have taken different positions about whether this statute, in stating that directors and officers "may be held personally liable" for conduct that amounts to "gross negligence" or worse, immunizes them from liability for conduct that is less culpable than gross negligence such as simple negligence. *Federal Deposit Insurance Corporation* v. *McSweeney,* 976 F. 2d 532, 537, n. 5 (CA9 1992), cert. denied, 508 U. S. 950 (1993); *Federal Deposit Insurance Corporation* v. *Canfield,* 967 F. 2d 443, 446, n. 3 (CA10) (en banc), cert. dism'd, 506 U. S. 993 (1992); *Federal Deposit Insurance Corporation* v. *Swager,* 773 F. Supp. 1244 (Minn. 1991). See also Pet. for Cert. i ("The questions presented for review are: 1. Whether Section 1821(k) supplants 'federal common law' and constitutes the exclusive standard of liability in a civil damage action brought by the Resolution Trust Corporation . . ."); Brief for American Bankers Association et al. as *Amici Curiae* 7–8.

In our view, the statute's "gross negligence" standard provides only a floor—a guarantee that officers and directors must meet at least a gross negligence standard. It does not stand in the way of a stricter standard that the laws of some States provide.

For one thing, the language of the statute contains a saving clause that, read literally, preserves the applicability of stricter state standards. It says "[n]othing in this paragraph shall impair or affect *any* right of the Corporation under other applicable law." 12 U. S. C. § 1821(k) (emphasis

added).   The petitioner, in contending that the statute displaces federal common law, says that "any right" means only a right created elsewhere in the same Act of Congress, for example, by various regulatory enforcement provisions. *E. g.*, § 1818(b) (cease-and-desist provision).   But that is not what the Act says nor does its language compel so restrictive a reading.   That language, read naturally, suggests an interpretation broad enough to save rights provided by other state, or federal, law.

For another thing, Congress enacted the statute against a background of failing savings associations, see 135 Cong. Rec. 121 (1989) (statement of Rep. Roth); 135 Cong. Rec. 1760 (1989) (statement of Sen. Graham), large federal payments to insured bank depositors, and recent changes in state law designed to limit pre-existing officer and director negligence liability.   See, *e. g.*, Fla. Stat. § 607.0831 (1993) ("recklessness or an act or omission . . . committed in bad faith or with malicious purpose"); Ohio Rev. Code Ann. § 1701.59(D) (1994) ("deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation").   The state-law changes would have made it more difficult for the Federal Government to recover, from negligent officers and directors, federal funds spent to rescue failing savings banks and their depositors.   And the background as a whole supports a reading of the statute as an effort to preserve the Federal Government's ability to recover funds by creating a standard of care floor.

The legislative history, insofar as it is relevant, supports this conclusion.   Members of Congress repeatedly referred to the harm that liability-relaxing changes in state law had caused the Federal Government, hence the taxpayer, as federal banking agencies tried to recover, from negligent officers and directors, some of the money that federal insurers had to pay to depositors in their failed banks.   *E. g.*, 135 Cong. Rec. 7150–7151 (1989) (statement of Sen. Riegle) ("[T]he establishment of a Federal standard of care is based

on the overriding Federal interest in protecting the soundness of the Federal Deposit Insurance Corporation fund and is very limited in scope. It is not a wholesale preemption of longstanding principles of corporate governance . . ."). To have pre-empted state law with a uniform federal "gross negligence" standard would have cured the problem in some instances (where state law was weaker) but would have aggravated it in others (where state law was stronger).

In fact, the legislative history says more. The relevant Senate Report addresses the point specifically. It says:

> "This subsection does not prevent the FDIC from pursuing claims under State law or under other applicable Federal law, if such law permits the officers or directors of a financial institution to be sued (1) for violating a lower standard of care, such as simple negligence." S. Rep. No. 101–19, p. 318 (1989).

This Report was not published until two weeks after Congress enacted the law. But, as petitioner elsewhere concedes, the Report was circulated within Congress several weeks before Congress voted. In fact Senator Riegle, the Banking Committee Chairman, read the statement, on his own behalf and that of Senator Garn, six weeks before Congress voted on the law. 135 Cong. Rec. 12374 (1989). Contrast *Clarke* v. *Securities Industry Assn.*, 479 U. S. 388, 407 (1987) (refusing to "attach substantial weight" to a Representative's statement *made* 10 days after the enactment of the law).

The history is not all on one side. The Congressional Record contains one statement that suggests a competing congressional purpose, namely, to protect bank officers and directors from too strict a liability standard. 135 Cong. Rec. 7150 (1989) (statement of Sen. Sanford) (supporting "provisions relating to State laws affecting the liability of officers and directors of financial institutions" because "these changes are essential if we are to attract qualified officers

and directors to serve in our financial institutions"). But we have not found other such statements. And that statement is inconsistent with the language of the Senate Report. It suggests an interpretation of the statute largely rejected in the lower courts, namely, that it pre-empts stricter state law as applied to state-chartered, as well as to federally chartered, institutions. See, *e. g.*, *McSweeney*, 976 F. 2d, at 540–541 (rejecting the interpretation as applied to state-chartered banks); *Canfield*, 967 F. 2d, at 448–449 (same).

The petitioner, in the courts below and as an alternative ground in this Court, made a final complicated argument to explain why 12 U. S. C. § 1821(k) displaces federal common law. He points to the universally conceded fact that the "gross negligence" statute applies to federal, as well as to state, banks. He then assumes, for sake of the argument, that in the absence of the statute, federal common law would determine liability for federal banks. He then asks why Congress would have applied the "gross negligence" statute to federal banks unless it wanted that statute to set an absolute standard, not a floor. After all, on the assumption that, without the statute, federal common law would hold federal directors and officers to a standard as strict, or stricter, there would have been no need for the statute unless (as applied to federal banks) it intended to set a universal standard, freeing officers and directors from the potentially less strict standard of the common law, and not what, given the assumptions, would be a totally unnecessary floor. This argument, taken to its logical conclusion, would also suggest that state standards of simple negligence would be displaced by the federal gross negligence statute.

One obvious short answer to this ingenious argument lies in the fact that our conclusion in Part II runs contrary to the argument's critical assumption, namely, that federal common law sets the standard of liability applicable to federal banks. State law applies. Without that assumption, the need for a "gross negligence" floor in the case of federally chartered banks is identical to the need in the case of state-chartered

banks. In both instances, the floor is needed to limit state efforts to weaken liability standards; in both instances a floor serves that purpose; and the reasons for believing the statute only sets such a floor are equally strong.

A more thorough answer lies in the fact that Congress nowhere separated its consideration of federally chartered, from that of state-chartered, banks. Congress did not ask whether one looked to federal common law or to state law to find the liability standard applicable to federally chartered banks. Nor did it try to determine the content of federal common law. One can reconcile congressional silence on the matter with a "gross negligence" statute, the language of which brings all banks (federal- and state-chartered) within its scope, simply by assuming that Congress, when enacting the statute, wanted to leave other law, including the law applicable to federally chartered banks, exactly where Congress found it. That, after all, is what the statute says. And the saving clause language taken at face value permits Congress to achieve its basic objective (providing a "gross negligence" floor) without having to unravel the arcane intricacies of federal common law. In our view, this understanding of congressional intent better explains the statute's language and history than the petitioner's interpretation, imputing to Congress an intent to apply a uniform "gross negligence" standard to federally chartered, but not state chartered, institutions.

For these reasons, the judgment of the Court of Appeals is vacated, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE SCALIA and JUSTICE THOMAS join, concurring in part and concurring in the judgment.

I join all of the Court's opinion, except to the extent that it relies on the notably unhelpful legislative history to 12 U. S. C. § 1821(k). *Ante,* at 228–230. As the Court cor-

rectly points out, the most natural reading of the saving clause in § 1821(k) covers both state and federal rights. *Ante*, at 228. With such plain statutory language in hand, there is no reason to rely on legislative history that is, as the majority recognizes, "not all on one side." *Ante*, at 229.