USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1228

 SECURITIES AND EXCHANGE COMMISSION,

 Plaintiff, Appellee,

 v.

 LEHMAN BROTHERS, INC.,

 Relief Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Patti B. Saris, U.S. District Judge]

 Before

 Selya, Boudin and Lipez, Circuit Judges.
 

 John D. Donovan, Jr. with whom Mark P. Szpak, Crystal D.
Talley and Ropes & Gray were on brief for appellant.
 Henry F. Minnerop, Brown & Wood LLP, Stuart J. Kaswell and
Fredda L. Plesser, Office of the General Counsel, on brief for
Securities Industry Association, Inc., Amicus Curiae.
 Mark Pennington, Senior Litigation Counsel, Securities and
Exchange Commission, with whom Colleen P. Mahoney, Acting General
Counsel, Jacob H. Stillman, Associate General Counsel, Diane V.
White, Senior Counsel, and Paul Gonson, Solicitor, were on brief
for appellee. 

 

October 5, 1998

 
 
 BOUDIN, Circuit Judge. This difficult case concerns a
preliminary injunction obtained by the Securities and Exchange
Commission to freeze certain assets in the brokerage account of
Emanuel Pinez who (according to the SEC) secured those assets
through unlawful insider trading. The assets were held in Pinez's
brokerage account with Lehman Brothers, Inc., which claimed an
overriding security interest in the assets. Having failed to
persuade the district court on this point, Lehman Brothers now
appeals.
 The background facts are essentially undisputed. Pinez,
who was chairman of Centennial Technology, Inc., opened a personal
brokerage account with Lehman Brothers in February 1996. Frederick
E. Pierce II became Pinez's account representative at Lehman
Brothers. In September 1996, Pinez executed a margin account
agreement with Lehman Brothers (explicitly to be governed by New
York law); the agreement permitted him to borrow from Lehman
Brothers to cover a portion of the cost of his purchases. The
agreement also gave Lehman Brothers a security interest as
collateral for any margin debt in all assets held in the account. 
 During 1996, Centennial stock performed remarkably well,
reaching a high of $58 per share in December 1996. According to
the SEC, the reason was fraudulent bookkeeping by Pinez, including
fictitious sales and inventory figures. Indeed, after the events
to be recounted, the company revised its financial statements to
show a $28 million loss for the three-and-a-half years ending in
December 1996, rather than the $12 million profit originally
reported.
 Well before this public restatement, reports began to
appear in newspapers in January and February 1997, suggesting
doubts about Centennial's earnings and management. Throughout
January 1997, the price of Centennial stock fell, reaching $23.75
on January 31, 1997. On February 5, 1997, Centennial's board of
directors set up a special committee to investigate the company's
earnings, and the vice chairman of the board told Pinez the next
day that Pinez would likely have to leave if the company had to
restate its earnings.
 On February 7, 1997, Pinez called Pierce and directed him
to arrange a "zero-cost collar" on Centennial stock owned by Pinez;
Pinez then had almost $10 million in Centennial stock (at then-
current market prices) in his Lehman Brothers account. Pinez's
apparent purpose was to ensure that he would have the necessary
funds to cover his $5 million margin-account debt with Lehman
Brothers even if the market price of his Centennial-stock
collateral fell sharply and led Lehman Brothers to demand immediate
payment of the debt, as it was entitled to do under the margin
account agreement.
 A zero-cost collar involves two contemporaneous
transactions: the sale (here, by Pinez) of call options, giving the
option buyers the right to purchase from the seller up to a certain
amount of the stock at a fixed price, and the purchase (again by
Pinez) of an equal number of put options, giving the buyer the
right to sell a similar amount of stock to the sellers of the puts
at some future period at a similar or closely related fixed price. 
What matters here is that the put options that Pinez acquired
became assets held in his Lehman Brothers margin account.
 When Pinez called Pierce on February 7, 1997, Pierce
asked whether Pinez was in a "quiet period," during which he would
be precluded from trading in Centennial securities; Pinez said that
he was not. Pierce then obtained the necessary approvals from
Lehman Brothers. Pierce filled the order the same afternoon,
selling 2700 Centennial "call" options and purchasing 2700
Centennial "put" options. At this time, Pinez's account at Lehman
Brothers held securities (mostly Centennial stock) providing barely
adequate collateral for Pinez's total margin debt.
 Whatever Lehman Brothers should or might have suspected
on February 7, 1997, there is no claim by the SEC that Lehman
Brothers knew at that time either that Pinez had falsified
Centennial's financial statements or that this possibility was
under investigation by Centennial's board. However, on February
11, 1997, Centennial announced publicly that it was undertaking an
inquiry into its earlier financial statements, that it had removed
Pinez from its management, and that the New York Stock Exchange had
suspended trading in Centennial stock. Lehman Brothers issued an
immediate margin call demanding that Pinez pay it all outstanding
margin debt, then more than $6 million. Pinez failed to do so. 
Lehman Brothers now had a contractual claim against Pinez for his
margin debt, a claim Lehman Brothers much later reduced to a state-
court judgment.
 In the meantime, one of the valuable assets in the Pinez
account was the 2700 put contracts giving Pinez as put owner the
right to make the unfortunate put sellers pay $20 per share for
Centennial stock now worth much less. Before Lehman Brothers could
take advantage of this opportunity to dispose of its security, the
SEC on February 14, 1997, brought the present civil action in the
district court and obtained an ex parte temporary restraining order
"freezing" all assets in Pinez accounts with various financial
institutions, including Lehman Brothers. The government also began
criminal proceedings against Pinez.
 The SEC's civil action, out of which the present appeal
grows, charged Pinez with having secured the put options through
the unlawful use of inside information--specifically, knowledge
that Centennial's financial health was much worse than publicly
known--in violation of various securities law requirements,
primarily section 10(b) of the Securities Exchange Act of 1934, 15
U.S.C. 78j(b). Lehman Brothers was later named in an amended
complaint as a "relief defendant." One object of the complaint was
to require "disgorgement" by Pinez of his "ill-gotten gains,"
including the put options that are the subject of this case. By
agreement of the parties, the put options were liquidated before
they expired, so the controversy is now about the proceeds.
 Following the grant of the temporary restraining order,
the district court held a hearing on March 6, 1997, on the SEC's
request to transform the now expired TRO into a preliminary
injunction. Despite the expiration of the TRO, Lehman Brothers, as
a courtesy to the court, agreed to maintain the proceeds derived
from the put options in an escrow account while the court
considered the SEC's motion. Those proceeds now represent almost
$5 million, which Lehman Brothers says is barely enough to cover
the still unpaid portion of Pinez's margin-account debt.
 On December 16, 1997, the district court released a
memorandum and order granting the instant preliminary injunction
insofar as it maintained a freeze on Pinez's assets, including the
put option proceeds held in escrow by Lehman Brothers. SEC v.
Pinez, 989 F. Supp. 325 (D. Mass. 1997). After detailed analysis
of federal and state law, the court concluded that at trial the SEC
was likely to establish not only that Pinez had committed fraud in
acquiring the put options, but also that "Lehman [Brothers] is not
a bona fide purchaser of those securities . . . ." Id. at 345. 
This appeal followed.
 In this court, Lehman Brothers has assumed that but for
its asserted security interest in the margin account assets, the
SEC would have a valid claim to recoup the proceeds as the product
of an unlawful transaction by Pinez (the put options purchases). 
Conversely, the SEC has assumed that its claim to the proceeds is
subordinated if Lehman Brothers is treated as a bona fide purchaser
of the put options for value; the SEC does not dispute that Lehman
Brothers should be treated as a purchaser for value, and the
relevant law supports this concession.
 Accordingly, the dispute--as framed by the parties--is
whether Lehman Brothers is a bona fide purchaser. We accept the
assumptions of the parties but do not independently endorse them. 
Cf. In re Newport Plaza Assoc. v. Durfee Attleboro Bank, 985 F.2d
640, 643-44 (1st Cir. 1993). As to the law governing Lehman
Brothers' status as a bona fide purchaser, the SEC regards the
issue as governed by New York law, while Lehman Brothers invokes
federal securities law. We address the legal issues in that order.
 New York law is a sound starting point because in this
instance, as in most commercial transactions, state law provides
the matrix of background rules and is ordinarily displaced, if at
all, only by conflicting or field-occupying provisions of federal
statutory law, or occasionally by federal common law. See Attertonv. FDIC, 519 U.S. 213 (1997); Wallis v. Pan American Petroleum
Corp., 384 U.S. 63, 68 (1966). Here, the margin account agreement
relied on by Lehman Brothers for its priority is expressly governed
by New York law.
 The parties agree that save as federal law may dictate
otherwise, Lehman Brothers' rights to the proceeds vis-a-vis the
SEC are controlled by article 8 of New York's Uniform Commercial
Code, N.Y.U.C.C. 8-301 et seq. (McKinney 1987). Article 8
governs investment securities, and section 8-302 defines a "bona
fide purchaser" as "a purchaser for value in good faith and without
notice of any adverse claim" who obtains a security (under certain
specified conditions which the SEC here assumes to have been
satisfied). Section 8-302(3) then provides: "A bona fide purchaser
in addition to acquiring the rights of a purchaser (Section 8-301)
also acquires his interest in the security free of any adverse
claim."
 "Adverse claim" is defined in fairly general terms (in
section 8-302(2)) but we need not pursue the subject because the
SEC appears to assume that its own claim for "disgorgement" of the
put options (or their proceeds) constitutes an adverse claim that
would not prevail against a bona fide purchaser. Instead, it says
that it is entitled to prevail over Lehman Brothers because Lehman
Brothers, even though a "purchaser for value," was not one "in good
faith and without notice of any adverse claim." N.Y.U.C.C. 8-
302.
 The factual predicate for the SEC's position is that
Pinez was known to be an insider, he was engaging in a transaction
that made a good deal of sense if one expected a dip in the price
of his stock, and there was some public information suggesting that
the company might be in more difficulty than its past financial
reports would indicate. These facts are undisputed and we will
assume, in unison with the SEC, that they amply amount to
suspicious circumstances that should have alerted Lehman Brothers
to the possibility of trouble.
 The key to the SEC's legal argument is that Lehman
Brothers' disregard of "suspicious circumstances" deprives it of
bona fide purchaser status (Lehman Brothers did make a brief
inquiry of Pinez as already recounted, but no more). In the words
of the district court, which took a similar view of New York law,
"a failure to act on actual knowledge of suspicious circumstances
constitutes bad faith on the part of a lienholder" and thereby
defeats a claim of bona fide purchaser status. Pinez, 989 F. Supp.
at 344. Lehman Brothers, by contrast, asserts in its brief that
under New York's UCC, "good faith" is "entirely 'subjective,' andthat it excludes any duty of inquiry."
 We adopt neither position outright, but think that the
law is closer to Lehman Brothers' view. In our view, the emphasis
in the New York case law is on subjective bad faith and
dishonesty, an emphasis echoed in parallel provisions of section
3-304 which--in relation to commercial paper--describe notice of a
claim or defense as including "knowledge of such facts that his
action in taking the instrument amounts to bad faith." N.Y.U.C.C.
 3-304(7) (McKinney 1987). Although the case law provides the
decisive gloss, plain language confirms it: in ordinary parlance,
one can certainly be "suspicious," without being dishonest, in
deciding to proceed with a transaction where suspicions are
outweighed by competing considerations.
 New York has deliberately adopted a standard somewhat
more favorable to the recipient of the securities than have a
number of other states. As New York's highest court has noted, New
York and Virginia are the only states to insist that notice "be
determined by a subjective test of actual knowledge." Hartford,
542 N.E.2d at 1094; see also Chemical Bank, 411 N.E.2d at 341; cf.Lawton v. Walker, 343 S.E.2d 335, 337-38 (Va. 1986) (construing the
parallel provision of the Virginia UCC 8.3-304). Where one draws
the line, in requiring more or less inquiry by the purchaser, is a
policy choice; the New York legislature could plausibly choose to
facilitate stock transactions by limiting the obligation to inquire
and giving bona fide purchaser status a generous reach.
 The SEC points to cases that forbid someone from
deliberately averting his eyes from evident misconduct. We agree
that such conduct, even if literally short of actual knowledge,
could fairly be equated with dishonesty or bad faith. But there is
nothing in the facts before us to suggest that Pinez's use of a
"collar" transaction could only be explained by the use of inside
information. Nor has the SEC shown that Lehman Brothers
deliberately closed its eyes to some easily obtained information
that would have confirmed that Pinez was engaging in securities
fraud. 
 Indeed, we can imagine in extreme circumstances imputing
bad faith to a purchaser who had very strong suspicions of grave
misconduct, who could readily have verified or dispelled the
suspicion, and who failed to do so without any plausible excuse. 
To this limited extent, there may be a duty of inquiry where a
failure to inquire amounts to bad faith. But here, misconduct was
merely a possibility; Lehman Brothers had been directed to execute
an immediate transaction, and the SEC does not suggest how it could
have swiftly and definitely assured itself that no insider
information had been used.
 Taking New York law to require dishonesty and not mere
suspicion, and applying that standard to the facts currently of
record, we do not think that the SEC has shown a reasonable
likelihood of prevailing against Lehman Brothers on the merits. 
This disagreement with the able district judge rests primarily on
our reading of New York law which we assess de novo. Of course,
the present record does not reflect an evidentiary hearing, let
alone a full trial; whether eventually the SEC might adduce more
facts that would meet the dishonesty standard is another matter.
 This brings us to the question whether federal law
supersedes state law, either in favor of Lehman Brothers or in
favor of the SEC. Lehman Brothers relies on two provisions of the
federal securities law, which it reads as saying that only "actual
knowledge" of Pinez's violation would impair its security interest. 
Conversely, the district judge, but not the SEC, thinks that a
third provision of the federal securities laws makes suspicious
circumstances enough. We think that none of the three provisions
cited alters the result in this case.
 Lehman Brothers first relies upon section 29(b) of the
Securities Exchange Act of 1934, 15 U.S.C. 78cc(b). In pertinent
part, section 29(b) provides as follows:
 Every contract made in violation of any
 provision of this chapter . . . shall be void
 (1) as regards to the rights of any person
 who, in violation of any such provision . . .
 shall have made or engaged in the performance
 of any such contract, and (2) as regards to
 the rights of any person who, not being a
 party to such contract, shall have acquired
 any right thereunder with actual knowledge of
 the facts by reason of which the making or
 performance of such contract was in violation
 of any such provision . . . .

Relying on subsection (2), Lehman Brothers argues that the "actual
knowledge" requirement controls, with no ifs or buts based on
suspicious circumstances.
 We will assume without deciding that Lehman Brothers is
right in its reading of the phrase "actual knowledge." We will
also assume that Lehman Brothers is a person who, "not being a
party" to such put option contracts, acquired a right thereunder,
namely, the right as successor to Pinez to enforce the put options
contracts. It therefore would follow from these (untested)
assumptions that Lehman Brothers could defeat any claim under
section 29(b) by the put options sellers that, because of Pinez's
violation, the contracts were "void."
 But subsections (1) and (2) are merely limitations on the
consequences that would otherwise be visited by the principal
directive of section 29(b), namely, that the options contracts
would be voidable under federal law. No one, including the SEC,
says that Lehman Brothers cannot enforce the options contracts, as
it has already done in liquidating them. Instead, the SEC is
challenging Lehman Brothers' security interest in the proceeds
created by the margin agreement and is arguing that that security
interest, created by New York law, is also undermined by New York
law because of Lehman Brothers' alleged bad faith.
 If there were conflict between section 29(b) and New York
law, the latter would give way under the Supremacy Clause. There
is no such conflict. Section 29(b) is a federal law that makes the
put option contracts unenforceable by the buyer against the seller
where acquired through the buyer's violation of "this chapter"
(presumably, Lehman Brothers was rescued by subsection (b)(2)). 
The New York UCC provision relied on by the SEC does not contradict
this outcome; it merely gives the SEC an independent ground under
New York law for saying that Lehman Brothers has no valid security
interest, a security interest that Lehman Brothers itself assumes
it needs in order to prevail over the SEC.
 Lehman Brothers' other resort is to section 29(c)(1), 15
U.S.C. 78cc(c), which in pertinent part provides as follows:
 Nothing in this chapter shall be
 construed (1) to affect the validity . . . .
 of any lien . . . unless at the time of . . .
 the creating of such lien, the person . . .
 acquiring such lien shall have actual
 knowledge of facts by reason of which . . .
 the acquisition of such lien is a violation of
 the provisions of this chapter . . . . or (2)
 to afford a defense to . . . the enforcement
 of any lien by any person who shall have
 acquired such . . . lien in good faith for
 value and without actual knowledge of the
 violation of any provision of this chapter . .
 . .

The literal language of subsection (1) is no help to Lehman
Brothers since it merely protects the lien (i.e., the security
interest) against any provision of the Securities Exchange Act that
might otherwise be taken to invalidate it. Here, the SEC is
relying upon provisions of the New York UCC--not "this chapter"--so
the quoted language of section 29(c) does not by its terms apply.
 To be sure, in unusual circumstances a federal statute
like section 29(c)(1) might be judicially expanded to protect the
validity of the favored lien not just against the provisions of
"this chapter" but against invalidation on any basis; literal
language does not always prevail. Cf. Church of Holy Trinity v.
United States, 143 U.S. 457 (1892). But it would require a
remarkable showing to persuade a court to read out of the statute
the explicit limiting phrase ("in this chapter"). No such argument
has even been attempted by Lehman Brothers.
 For a similar reason, we think that the district court
read too broadly the subsection (2) of the same section 29(c),
quoted above, which says that the Securities Exchange Act shall not
be read to give a defense to enforcement of a lien where the lien
holder acquired it "in good faith for value and without actual
knowledge" of any violation of that statute. The district court
took this provision to mean--apparently without support from the
SEC--that "federal law governs Lehman's status as a bona fide
purchaser in an action to enforce its lien." 989 F. Supp. at 343. 
Yet read literally, section 29(c)(2) is concerned only with the
possible use of the federal statute, not New York law, to
invalidate a lien.
 Further, section 29(c)(2) does not by itself purport to
invalidate any lien: it merely provides a defense to lien
invalidation under certain circumstances. The possible reach of
the defense is beside the point unless and until someone makes out
a claim of invalidity, and the only effort to do so here--the SEC's
claim of invalidity under New York law--has thus far fallen short. 
We leave for another day the interesting question whether the
defense could ever operate where the attack on a lien was premised
primarily upon state law and where state law invalidated a lien
even of a good faith purchaser for value without actual knowledge
of the securities-law violation. 
 Ordinarily, our reasoning would lead us to vacate the
preliminary injunction at once. However, the put options have been
reduced to a sum of money being held by Lehman Brothers in escrow,
and there is no obvious harm to Lehman Brothers in maintaining the
escrow in the short run. Possibly (the issue has not been argued)
the SEC's ability to obtain "disgorgement" of these proceeds
depends on the separate maintenance of this concrete stake, since
there is no claim that Lehman Brothers itself violated the
securities laws.
 On remand, the district court can ascertain whether or
not the SEC desires to pursue its disgorgement claim in light of
our reading of New York law. If so, the district court can also
decide whether the preliminary injunction is needed to avoid
mooting the case; if there is such a need, and some prospect of
success, the district court may choose to maintain the preliminary
injunction, pending a prompt trial. See Washington Metro. Area
Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844-45 (D.C.
Cir. 1977).
 Accordingly, the matter is remanded for further
proceedings consistent with this opinion.