**AIRADIGM COMMUNICATIONS, INC., Plaintiff,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Defendant.**

No. 06–155.

United States Bankruptcy Court, W.D. Wisconsin.

Oct. 27, 2006.

Kathryn A. Pamenter, Ronald Barliant, Chicago, IL, for Plaintiff.

Rodney Allen Morris, US Dept of Justice, Civil Division, Mary A. DeFalaise, Washington, DC, for Defendant.

MEMORANDUM DECISION

ROBERT D. MARTIN, Bankruptcy Judge.

The parties to this adversary proceeding have filed cross-motions for summary

judgment, asking two questions left unanswered by the Supreme Court's 2003 decision in *Federal Communications Commission v. NextWave Personal Communications, Inc.*, 537 U.S. 293, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003). The questions, broadly stated, are: to what extent are debts owed to the Federal Communications Commission ("FCC") treated differently from other claims in bankruptcy; and, does the Communications Act of 1934, as amended, and regulations thereunder, preempt or otherwise supersede state commercial laws.

## I. BACKGROUND

*PCS Spectrum Licenses*

The FCC is the federal agency charged with licensing use of the airwaves. The Communications Act gives the FCC the authority to issue radio licenses in a manner that will serve the "public interest, convenience, and necessity." 47 U.S.C. § 309(a) (2000). Use of FCC licenses by mobile telephone companies has grown rapidly in the last decade. Plaintiff, Airadigm Communications, Inc. ("Airadigm"), is a mobile telephone company that holds 15 PCS (Personal Communications Services) licenses ("the licenses") in Wisconsin, Iowa and Michigan.

Section 309(j) of the Communications Act authorizes the FCC to grant PCS licenses "through a system of competitive bidding." 47 U.S.C. § 309(j)(1). "Section 309(j) serves a variety of purposes, including the development and rapid deployment of new technologies and services for the benefit of the public; recovery for the public of a portion of the value of the public spectrum resource; and promotion of the 'efficient and intensive use of the electromagnetic spectrum.'" Def. Mem.

in Supp. at 2; 47 U.S.C. §§ 309(j)(3)(A); 309(j)(3)(C)-(D). "Since a bidder's ability to introduce valuable new services and to deploy them quickly, intensively, and efficiently increases the value of a license to a bidder, an auction design that awards licenses to those bidders with the highest willingness to pay tends to promote the development and rapid deployment of new services in each area and the efficient and intensive use of the spectrum." *In re NextWave Personal Communications, Inc.*, 200 F.3d 43, 52 (2d Cir.1999) (internal citations omitted).

In adopting a system of competitive bidding, Congress was "concerned that, unless the Commission is sensitive to the need to maintain opportunities for small businesses, competitive bidding could result in a significant increase in concentration in the telecommunications industries." H.R.Rep. No. 111, 103d Cong., 1st Sess. 254 (1993), U.S.Code Cong. & Admin.News 1993, pp. 378, 581. Congress therefore directed the FCC to promote "economic opportunity and competition ... by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses." 47 U.S.C. § 309(j)(3)(B). To facilitate small business participation, the Communications Act instructs the FCC to "consider alternative payment schedules and methods of calculation, including lump sums or guaranteed installment payments." 47 U.S.C. § 309(j)(4)(A). In response, the FCC adopted a variety of specialized preferences, including bidding discounts, installment payment plans, and spectrum set-asides to help small businesses and other favored groups compete.

The FCC also adopted two strategies to protect the public's property interest in

the licenses. First, it resolved to cancel the licenses of any licensee that failed to make installment payments on time. Second, it took security interests in all licenses being paid for in installments. The FCC gave notice to the public of its security interests by filing financing statements under the Uniform Commercial Code, noting its lien on each of the licenses,[1] and posting the full license documents on its website.[2] Counsel for the FCC stated at oral arguments that it took all of these steps as a "belt and suspenders" approach to maintaining its interest. That is, the FCC did not believe it needed to perfect its interests under state law because federal law governs the validity of security for federal loans, but it did so anyway. Importantly, the FCC's liens enjoyed the highest priority because 47 U.S.C. §§ 301 and 304 provide that a broadcast license issued by the FCC does not convey a property interest in which another party could assert rights contrary to the FCC's regulatory powers. *In re Media Props., Inc.*, 311 B.R. 244, 247 (Bankr.W.D.Wis. 2004). Transfer of licenses to a third party is permissible only with express approval of the FCC. *See F.C.C. v. WOKO, Inc.*, 329 U.S. 223, 229, 67 S.Ct. 213, 91 L.Ed. 204 (1946).

### Widespread Default

Airadigm and other small companies acquired wide swaths of PCS spectrum at eye-popping prices in two auctions (Nos. 5 and 11) in the mid–1990s. Soon they had trouble paying their debts to the FCC. In 1997, the FCC suspended default, cancellation, late fees, and penalties for all licensees who were on installment plans. *In the Matter of Amendment of the Commission's Rules Regarding Installment Payment Financing for PCS Licensees,* 14 F.C.C.R. 6571, 1999 WL 183822 (1999).

On June 5, 1998, Airadigm agreed to retain all 15 of its licenses and to resume installment payments in 1999, rather than surrender the licenses. However, two days before its first installment was due, Airadigm filed for relief under chapter 11 of the Bankruptcy Code in this court ("the 1999 case"). A number of other small telecommunications companies filed bankruptcy at about the same time. The most prominent of these were the NextWave companies.

### NextWave

NextWave filed its chapter 11 in the Southern District of New York. It immediately initiated an adversary proceeding against the FCC for fraudulent conveyance, arguing that its licenses were less than reasonably equivalent value for the several billion dollars paid. In response, the FCC canceled NextWave's licenses and tried to reauction them.

The Bankruptcy Court ruled for NextWave, the District Court affirmed, and the U.S. Court of Appeals for the Second

---

**1.** On Page 2 of each "Radio Station Authorization," the FCC prints: "This authorization is conditioned upon the full and timely payment of all monies due pursuant to Sections 1.2110 and 24.711 of the Commission's Rules and the terms of the Commission's installment plan as set forth in the *Note and Security Agreement executed by the licensee.* Failure to comply with this condition will result in the automatic cancellation of this authorization."

Def. Exh. 6 (emphasis added); *see* FCC Form 463a.

**2.** *See, e.g.,* PCS Broadband License Number KNLF394: Airadigm Communications, Inc., *available at* http://wireless2.fcc.gov/UlsApp/UlsSearch/licenseAdminSum.jsp?licKey =9071 & printable (last visited Oct. 5, 2006).

Circuit reversed.[3] The FCC argued that the courts lacked jurisdiction over the FCC's regulatory functions and that the condition of full payment in NextWave's licenses was inextricable from the licenses themselves. Br. for Appellant at 25, *In re NextWave Personal Communications, Inc.*, 200 F.3d 43 (2d Cir.1999). Ultimately, the Court of Appeals adopted the FCC's view. *Id.; In re F.C.C.*, 217 F.3d 125 (2d Cir.), *cert. denied*, 531 U.S. 1029, 121 S.Ct. 606, 148 L.Ed.2d 518 (2000).

When the Supreme Court denied certiorari in the Second Circuit case, NextWave petitioned the FCC itself. The FCC declined to reconsider cancellation of NextWave's licenses. On appeal, the U.S. Court of Appeals for the District of Columbia Circuit held that canceling NextWave's licenses violated § 525(a) of the Bankruptcy Code, which prohibits a government agency from revoking a license solely because the licensee filed for bankruptcy or did not pay a debt dischargeable in bankruptcy. *NextWave Personal Communications, Inc. v. FCC*, 254 F.3d 130 (D.C.Cir. 2001).

The Supreme Court granted certiorari and affirmed the D.C. Circuit. *FCC v. NextWave Personal Communications, Inc., supra*. The Court agreed with NextWave that the plain language of § 525(a) prohibited the FCC from canceling NextWave's licenses. The Court rejected the FCC's argument that its insistence on full payment was a regulatory condition and not a debt that could be discharged in bankruptcy. *Id.* at 302, 123 S.Ct. 832. Instead, it held that § 525(a) governed all debts, whether or not they were also regu-

latory conditions. *Id.* at 303, 123 S.Ct. 832. The Court also held that there was no conflict between the Communications Act and the Bankruptcy Code, because the FCC's demand for payment in full was an "administrative preference" which did not affect the Bankruptcy Code. *Id.* at 304, 123 S.Ct. 832. Finally, the majority acknowledged the seemingly anomalous result that a private creditor could revoke licenses (such as those granting the use of a trademark) on account of a debtor's filing for bankruptcy, but under the anti-discrimination provisions of § 525, the U.S. Government could not. *Id.* at 307–08, 123 S.Ct. 832. The language of the statute clearly required that result. *Id.*

### Airadigm's Progress

While the FCC and NextWave were taking their cases up and down the judicial ladder, on October 13, 2000 Airadigm and some of its creditors proposed a Collective Plan of Reorganization which provided for a number of foreseeable contingencies. By then, the FCC had cancelled Airadigm's licenses, but had permitted Airadigm to continue operating under them. The FCC had filed a proof of claim for $64,219,442.55 plus interest. On November 15, 2000, this court confirmed Airadigm's Amended Plan of Reorganization ("the 2000 plan") over the FCC's objection.

The 2000 plan tacitly recognized that the licenses had been cancelled and it provided alternative means to implement the plan depending upon when the FCC might reinstate the licenses. The plan made no specific provision for its implementation if the FCC reinstated the licenses after June 30, 2002. It did provide that, irrespective of if

---

**3.** For a detailed explanation of the New York litigation, see John A. Rogovin and Rodger D. Citron, "Lessons from the NextWave Saga: The Federal Communications Commission, the Courts, and the Use of Market Forms to Perform Public Functions," 57 Admin. L.Rev. 687, 699–703 (Summer 2005).

or when the FCC reinstated the licenses, the FCC's regulatory rights would be preserved. 2000 Plan ¶¶ 2.39, 5.1, 12.5.

The Supreme Court decided *NextWave* on January 27, 2003. Seven months later, the FCC acknowledged that *NextWave* applied to Airadigm's licenses. *In re Airadigm Communications, Inc.*, 2003 WL 21878647, 18 F.C.C.R. 16296 (2003). There has been no other reinstatement or reissuance of the Airadigm licenses. On May 20, 2004, this court allowed the FCC's claim for the full $64,219,442.55. The FCC claim was never paid.

*Lapse*

The FCC did not file UCC continuation statements covering its Airadigm security interests until June 29, 2006. That was much more than five years after its UCC financing statements were initially filed. Thus, in the midst of the many strands of litigation, the FCC's financing statements all lapsed—some on June 2, 2002 and some on July 28, 2002.

*The 2006 Case*

Before the 1999 case was closed, Airadigm filed a second chapter 11 petition on May 8, 2006. The FCC objected. At the hearing on many first-day motions, counsel for Airadigm stated that Airadigm filed the second case

> to solve a problem that everybody thought was solved six years ago but became unsolved because by the time the FCC acted, these licenses couldn't be sold for enough money to pay everybody off. And now the value of the licenses is much less than the debt ... in the area of $30 to $40 million less.... [T]he way we plan to do that is through a cram down plan. The only way we can cram down on the secured creditor is to know what the secured plan is, and the

> only way we can do that is the value of the licenses. That's the reason for this case....

Transcr. of May 10, 2006, Docket No. 06–10930, Doc. No. 89.

Ultimately the FCC withdrew its objection to the filing of the second case as part of a stipulation preserving all parties' rights from the first case. Since then, this court has conducted a valuation hearing and determined that Airadigm's licenses are now worth a total of $33,009,164.

On June 30, 2006, Airadigm commenced this adversary proceeding, claiming that the FCC's security interest is unperfected because of the lapsed financing statements, or that the FCC had no security interest whatsoever because the 2000 plan did not expressly preserve it. *Id.* at ¶¶ 13–16. The FCC denies Airadigm's claims and pleads affirmative defenses of res judicata, collateral estoppel, judicial estoppel, failure to state a claim, and waiver. Am. Answer at ¶¶ 1–5. In addition, the FCC claims that Airadigm's claims were barred by the Communications Act and FCC regulations granting the FCC the absolute right to full payment of Airadigm's obligations. *Id.* at ¶ 6. Both parties moved for summary judgment.

## II. JURISDICTION

Subject matter jurisdiction over the complaint exists under 28 U.S.C. § 1334(b). Jurisdiction over the FCC's counterclaims for declaratory judgment exists under 28 U.S.C. §§ 1334(b) and 2201. *See* Fed. R. Bankr.Proc. 7001(9); *Headline Promotions, Inc. v. Trupiano (In re Headline Promotions, Inc.)*, 2001 WL 1346061, 47 Collier Bankr.Cas.2d 250 (Bankr.N.D.Ill. Oct.30, 2001) ("Pursuant to Federal Rule of Bankruptcy Procedure

7001(9), the court may enter a declaratory judgment relating to any of the matters set forth in Bankruptcy Rule 7001"). It is within the court's discretion whether to hear the declaratory judgment action. *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1942). Because of the significant uncertainty of the effect of confirming a plan which treats the FCC's claim as undersecured, I will rule on the declaratory judgment counterclaims.

This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (K), and (O).

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In analyzing whether a question of material fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Material facts are those facts that under the applicable substantive law "might affect the outcome of the suit." *Id.* at 248, 106 S.Ct. 2505.

In opposing a motion for summary judgment, a party cannot merely rest on allegations in the pleadings or on conclusory allegations in an affidavit, but must present specific evidence that a material factual issue exists that must be decided at trial. *See Koclanakis v. Merrimack Mut. Fire Ins. Co.*, 899 F.2d 673, 675 (7th Cir. 1990); *Mestayer v. Wisconsin Physicians Service Ins. Corp.*, 905 F.2d 1077, 1079 (7th Cir.1990); *Valentine v. Joliet Township High School Dist. No. 204*, 802 F.2d 981, 986 (7th Cir.1986).

### IV. EFFECT OF THE 2000 PLAN ON FCC LIENS

▮] Section 1141(c) of the Bankruptcy Code provides, in part:

> except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

11 U.S.C. § 1141(c) (1999 & 2006). Security interests and conditions to retention of licenses are both interests of creditors. *Matter of Penrod*, 50 F.3d 459, 463 (7th Cir.1995); *see* 11 U.S.C. §§ 101(37) and (51) (defining "lien" and "security interest"). Airadigm correctly points out that the 2000 plan did not expressly preserve the FCC's security interests. The plan did, however, preserve the FCC's regulatory rights, including the license conditions. Thus, the licenses did not pass through plan confirmation free and clear of the FCC's claims and interests. Due to the odd circumstances that attended confirmation of the 2000 plan, particularly the parties' understanding that Airadigm had lost its rights in the licenses, there would have been no sense in preserving the FCC liens. The Supreme Court's subsequent ruling in *NextWave* that the FCC's rights should be characterized as security interests does not nullify their preservation in the plan as regulatory conditions.

Like a security interest, a condition that a creditor places on retention of a license

is an interest of a creditor within the meaning of § 1141(c). While the 2000 plan did not say that the FCC had a lien, it did provide that the FCC had rights in the licenses, and it protected those rights. The most pertinent of the license conditions was payment in full of the debt Airadigm incurred at auction. At least three provisions of the 2000 plan explicitly preserved that and other conditions: upon reinstatement of the licenses, the FCC would impose "reasonable conditions ... including a requirement of prompt payment in full," ¶ 2.39; upon reinstatement, Airadigm or a subsequent transferee would have to pay in full the FCC's claims relating to the reinstated licenses, ¶ 5.1; and most importantly, "the Confirmation Order shall not enjoin or in any way purport to limit, restrict, affect or interfere with action initiated by the FCC in the full exercise of its regulatory rights, powers and duties with respect to the Licenses," ¶ 12.5. The 2000 plan thus clearly provided that the licenses were not free and clear of the FCC's interest.

By the time the plan was proposed, the FCC had cancelled the licenses under the regulatory authority subsequently affirmed by the U.S. Court of Appeals for the Second Circuit in *NextWave. See In re NextWave Personal Communications,* 200 F.3d at 43; *In re FCC,* 217 F.3d at 125. That legal cancellation was a complete exercise of any rights which foreclosure of its security interest would have granted the FCC. There was no remaining legal attribute of a lien in the licenses which would have had any significance to either Airadigm or the FCC.

Section 1141(c) means that when a plan provides for a claim, all liens securing that claim are extinguished unless explicitly preserved. *Penrod,* 50 F.3d at 463. The argument that the U.S. Court of Appeals for the Seventh Circuit rejected in *In re Penrod* was that by failing to say that the creditor's claim was secured by the debtors' hogs, the confirmed plan did not "deal with" the collateral. *Id.* Airadigm had no licenses when the plan was confirmed. All references to the licenses in the 2000 plan were to *Reinstated* Licenses.[4] The nature of intangible property is such that the licenses and the rights they conveyed evaporated upon cancellation.[5] *Penrod* does not require that a lien which has been foreclosed must be preserved or treated as if it had yet to be foreclosed.

In distinguishing *Penrod,* I also distinguish a line of precedent in this court going back to *Matter of Wood,* 47 B.R. 774 (Bankr.W.D.Wis.1985). The consensual plan in *Wood* was to be funded by the debtor's ongoing dairy farming operations, but did not expressly preserve any liens in the debtor's cows. *Id.* at 777–78. When the debtor sold all of his cows post-confirmation, the creditors asked this court to infer from the funding provision that the debtor was required to maintain his dairy operation. *Id.* Instead, I held that the creditors "could have sought the inclusion of provisions restraining the sale of the cows and any other necessary assets," and that the confirmed plan did not create any liens by implication. *Id.* at 778. Like *Penrod, Wood* does not extinguish liens in collateral that the creditor completely repossessed prior to confirmation.

4. "Reinstated Licenses" was a term of art defined by the 2000 plan to mean "all Licenses as to which the FCC grants by Final Order the relief requested by the Debtor in the Petition for Reinstatement, provided such relief is

subject only to reasonable conditions imposed by the FCC. . . ." 2000 Plan ¶ 2.39.

5. Unlike Penrod's hogs.

It was only much later, when the Supreme Court decided *NextWave*, that the attributes of a lien were resurrected and related back to a time prior to confirmation of the 2000 plan. The Supreme Court's decision in *NextWave* affirmed that § 525 of the Bankruptcy Code prohibited the FCC from canceling PCS conditional licenses. That holding left the FCC with little remedy for non-payment except enforcement of security interests when licensees filed for bankruptcy. *NextWave* thus allows Airadigm and other licensees in bankruptcy to treat the FCC like any other party to a consensual security agreement. It does not, however, permit Airadigm to penalize the FCC for failing to protect its security interests qua security interests before *NextWave* suggested that it was necessary to do so.

By acknowledging that *NextWave* applied to Airadigm's licenses, the FCC restored the pre-cancellation status quo. The FCC's security interests resumed their vitality as security agreements and still satisfied the requirements for attachment in UCC Revised § 9–203(a) and (b). Assuming that the FCC's security interests cannot be avoided pursuant to the debtor in possession's strong arm power, § 544(a), they are effective now even though the 2000 plan did not expressly preserve them. In short, a subsequent Supreme Court decision cannot be read to nullify the plan's preservation of the FCC's interests.

## V. LIEN AVOIDANCE

Section 544 of the Bankruptcy Code gives a debtor in possession the right to avoid a prior creditor's security interest if a hypothetical lien creditor could do so on the date the debtor filed bankruptcy. If the FCC's security interest in the licenses was perfected on May 8, 2006, that interest is not voidable by Airadigm.

] Federal law governs perfection and priority of the FCC's security interest,[6] but it may incorporate state law as the federal rule of decision. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67, 63 S.Ct. 573, 87 L.Ed. 838 (1943). The Supreme Court has found three factors important in deciding whether the federal interests at stake are too important to incorporate state law as the rule of decision. First, the more obvious "[t]he desirability of a uniform rule," the greater the need for a special federal rule of decision. *Id.* Second, state law should not be incorporated where "a significant conflict exists between an identifiable federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). But third, if a special federal rule of decision would countervail "the importance of contractual certainty," a court should incorporate state law as the

---

**6.** Federal law governs federal lending programs irrespective of how comprehensive the loan-enabling law is. *E.g., First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 326 (6th Cir.2001) (SBA loan guaranty agreements); *U.S. v. Einum*, 992 F.2d 761, 762 (7th Cir. 1993) (Farmers Home Administration loan); *U.S. v. Great Plains Gasification Assocs.*, 813 F.2d 193, 195 (8th Cir.1987) (Dept. of Energy Nonnuclear Energy loan guaranty); *C.D. Barnes Assocs. v. Grand Haven Hideaway Ltd.*

*P'ship*, 406 F.Supp.2d 801, 807 (W.D.Mich. 2005) (HUD mortgage insurance); *Yunis v. United States*, 118 F.Supp.2d 1024, (C.D.Cal. 2000) (VA Home Loan Guaranty Program); *State of Montana v. United States*, 33 Fed.Cl. 433, 435 (1995) (Commodity Credit Corp. sugar price support loan); *see Clearfield Trust*, 318 U.S. at 366, 63 S.Ct. 573 ("When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power").

federal rule. *United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 597–99, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973); *see United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728–29, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) ("our choice of law inquiry must consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state law"). "[T]he Court's current approach to federal common lawmaking [demonstrates] . . . a preference for incorporation of state law absent a demonstrated need for a federal rule of decision." Richard H. Fallon, Jr., Daniel J. Meltzer & David L. Shapiro, *The Federal Courts and the Federal System*, 701 (5th ed.2003). Thus our first step is to examine the effect that a state law would have as the rule of decision.

The FCC's security interests are consensual security interests in personal property, thus subject to the UCC. UCC § 9–109(1) (2001). The Wisconsin UCC "governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral" because Airadigm is a Wisconsin corporation. UCC Rev. §§ 9–301(1), 9–307(b) (2003). If Revised Article 9 applies to the FCC's security interests they would all be unperfected by filing as of July 28, 2002 because the tolling provisions of Former Article 9 were revised out of the UCC.

Article 9 of the UCC was revised effective July 1, 2001, in the middle of Airadigm's 1999 case. Unless the UCC provides an exception, the 2001 revision of UCC Article 9 "applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before July 1, 2001." Wis. Stat. § 409.702(1) (2006). One such exception is that Revised Article 9 "does not affect an action, case, or proceeding commenced before July 1, 2001." Wis. Stat. § 409.702(3) (2006). "As is usual in transition provisions, subsection (c) provides that this Article does not affect litigation pending on the effective date." UCC Revised § 9–702, Official Comment 2 (2001).

However, it is indisputable that neither the 2006 case nor this adversary proceeding was pending when Revised Article 9 became effective. The FCC argues that because Airadigm's two chapter 11 cases overlapped, the 2006 case relates back to the filing of the 1999 case which was commenced before July 1, 2001. However, confirming the 2000 plan revested all property of that bankruptcy estate in the debtor long before July of 2001. 11 U.S.C. § 1141(b); *Wood*, 47 B.R. at 777 (confirmation of a chapter 11 plan revests property of the bankruptcy estate in the debtor). There was no pending litigation regarding perfection of the FCC's lien until after the filing of the 2006 Case. The FCC's financing statement had not even lapsed as of July 1, 2001. There is no basis for applying Former Article 9 on these facts, notwithstanding the parties' stipulation which arguably is to the contrary.

■ Airadigm does not dispute that the FCC's security interest was perfected by filing at the time the 1999 Case began. Because Revised Article 9 is silent as to any tolling of the expiration of perfection by filing, the FCC's financing statements lapsed by law on June 2 and July 28, 2002. But filing is not the only way to perfect a security interest under the UCC. The UCC provides that a security interest may be perfected according to federal statutes, regulations, and treaties that would otherwise preempt the UCC. Wis. Stat. § 409.311 (2006). There is no such stat-

ute, regulation or treaty in this case. The FCC's regulations merely require that the winning auction bids for spectrum licenses be paid in full. 47 C.F.R. § 1.2110(f) (1998). Instead, the FCC contends—and I agree—that "federal common law" does not incorporate the UCC to begin with, because application of the UCC would frustrate federal objectives with no corresponding benefit to the certainty of private contractual relations.

■ The need for nationwide uniformity alone is never sufficient to require a special federal rule of decision. *Atherton v. F.D.I.C.*, 519 U.S. 213, 219–220, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997); *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 88, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (describing uniformity prong as "that most generic (and lightly invoked) of alleged federal interests"); *Kimbell Foods*, 440 U.S. at 730, 99 S.Ct. 1448. More importantly, any need for uniformity would be met by adoption of the UCC as the federal rule of decision; Revised Article 9 has been enacted in every state in nearly identical form. *See Kimbell Foods*, 440 U.S. at 729, 99 S.Ct. 1448 (preferring the UCC to supply content to federal rule of decision); *United States v. Landmark Park & Assocs.*, 795 F.2d 683, 685 (8th Cir.1986) ("uniform statute such as the UCC ... would ... not hinder the federal interest in uniformity of the law" [internal marks omitted]).

The other two factors identified by the Supreme Court, however, weigh heavily in favor of a special federal rule of decision. "[A] few areas, involving uniquely federal interests, are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed ... by the courts—so-called federal common law." *Boyle*, 487 U.S. at 504, 108 S.Ct. 2510. A state law frustrates federal objectives when it defeats or limits federal authority, or "would be inconsistent with the federal policy underlying" them. *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 465, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *see United States v. Allegheny County, Pa.*, 322 U.S. 174, 183, 64 S.Ct. 908, 88 L.Ed. 1209 (1944).

The UCC's manner of perfecting security interests creates a standardized notice system to simplify and strengthen commercial financing. Termination of perfection upon a lapse furthers this policy. However, enforcement of UCC lapse rules would hold the FCC's security interests unperfected even though every potential buyer of or lien creditor in the licenses would have actual notice of the FCC's lien. Airadigm's second chapter 11 filing would let Airadigm invoke a state law's rigor without regard to its purposes and avoid the FCC's lien. This result would obtain even though, as Airadigm's counsel stated in oral arguments, the only interest in the licenses which is attachable by a non-FCC creditor is an expectation of proceeds from some hypothetical future sale—a sale which the FCC itself would have to approve. 47 U.S.C. §§ 301, 304 (1999).

Not only would the loss cost the public fisc tens of millions of dollars, but it would undermine the entire system of competitive bidding which Congress directed the FCC to implement. The FCC's regulations requiring down payments and installment plans for licenses purchased in Auctions 5 and 11 were a direct, rational response to Congress's concern that small businesses were being shut out of the telecommunications industry. *See* H.R.Rep. No. 111, 103d Cong., 1st Sess. 254 (1993).

The FCC reasonably concluded that small businesses would continue to seek spectrum licenses only if the bidding process had credibility and integrity, that is, if previous bidders were required to pay in full for their licenses. *See In the Matter of Amendment of the Commission's Rules Regarding Installment Payment Financing for PCS Licensees,* 12 F.C.C.R. 16,436, ¶ 19, 1997 WL 643811 (1997). Given that federal law governs the loans and liens granted under the competitive bidding program, it would be insensible for it to incorporate a state law that would frustrate Congress's policy choices.

In *United States v. Kimbell Foods,* the Supreme Court found significant the voluntary nature of the federal government's transactions. But its concerns do not apply here. *Kimbell Foods* distinguished federal tax liens—to which special federal rules of decision apply—from voluntary transactions between government agencies and private parties. The Court wrote:

> To equate tax liens with these consensual liens also misperceives the principal congressional concerns underlying the respective statutes. The overriding purpose of the tax lien statute obviously is to ensure prompt revenue collection. The same cannot be said of the SBA and [Farmers Home Administration] lending programs. They are a form of social welfare legislation, primarily designed to assist farmers and businesses that cannot obtain funds from private lenders on reasonable terms. We believe that had Congress intended the private commercial sector, rather than taxpayers in general, to bear the risks of default entailed by these public welfare programs, it would have established a priority scheme displacing state law. Far from doing so, both Congress and the agen-

cies have expressly recognized the priority of certain private liens over the agencies' security interests, thereby indicating that the extraordinary safeguards applied in the tax lien area are unnecessary to maintain the lending programs.

*Kimbell Foods,* 440 U.S. at 734–735, 99 S.Ct. 1448. While the FCC loans are voluntary, they are available only for the specific purpose of purchasing licenses from the FCC at auction. The overriding purpose of the FCC bidding program is to distribute licenses to use the public airwaves in an equitable manner and ensure efficient use of the spectrum. The purpose is not purely fiscal. Def. Mem. in Supp. at 2.

Another important difference between the Airadigm transactions and those at issue in *Kimbell Foods* is that the FCC has not recognized the priority of private liens over its own interest. At the time of *Kimbell Foods,* the SBA loans in question were subordinate to certain state and local property tax liens, 15 U.S.C. § 646 (1978), while Farmers Home Administration loans were subordinate to purchase-money security interests, 7 C.F.R. § 1921.106 (1978), and certain junior subordinated private liens, 7 U.S.C. § 1981(d) (1976). *Kimbell Foods,* 440 U.S. at 735 n. 36, 99 S.Ct. 1448. There is nothing similar in this case. The only interest that a private entity may take in spectrum licenses is in proceeds of their sale. 47 U.S.C. § 310(d); *In re Media Props. Inc.,* 311 B.R. at 249–50. The government's interest here goes to the core of sovereignty in its territory, and the need for a special federal rule of decision is thus greater than when a federal agency acts principally as a lender.

The third factor of the Supreme Court's analysis also favors the FCC. "Creditors

who justifiably rely on state law to obtain superior liens would have their expectations thwarted whenever a federal contractual security interest suddenly appeared and took precedence." *Kimbell Foods,* 440 U.S. at 739, 99 S.Ct. 1448 (dictum). There is no risk of undermining state commercial laws here. No private entity can take a security interest in the licenses themselves, 47 U.S.C. § 310(d), and granting perfection to the FCC's security interest as a matter of federal law would not disturb a lien creditor's ability to reach the licenses' proceeds.

▇▇▇ The pertinent federal rule of decision is to "give priority to the lien that first became choate." *Straus v. United States,* 196 F.3d 862, 865 (7th Cir.1999). Choateness is a measure of whether "a lien has acquired sufficient substance and has become so perfected as to defeat a later-arising or later-filed federal [ ] lien." *United States v. Pioneer Am. Ins. Co.,* 374 U.S. 84, 88, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963). "The federal rule is that liens are perfected in the sense that there is nothing more to be done to have a choate lien—when the identity of the lienor, the property subject to the lien, and the amount of the lien are established." *Id.* at 89, 83 S.Ct. 1651 (internal marks omitted). The security agreements governing the licenses satisfied all three of these requirements when the FCC and Airadigm executed them in 1996.

The FCC's security interest became choate before the petition date, so it would have been superior to the interest of a hypothetical lien creditor on that date. Accordingly, a hypothetical lien creditor could not have avoided the FCC's interest. Neither can Airadigm. 11 U.S.C. § 544(a).

Because Airadigm cannot avoid the FCC's security interests under § 544, it is not necessary to consider the FCC's defenses of res judicata, collateral estoppel, judicial estoppel, and waiver.

## VI. FCC CLAIM IS UNDERSE-CURED

▇▇ Contrary to the FCC's assertion, the Debtor may bifurcate the FCC's debt into secured and unsecured parts. Section 506 of the Bankruptcy Code states that a creditor's allowed claim is secured "to the extent of the value of such creditor's interest in the estate's interest" in property, and that the remainder of the claim is unsecured.[7] The direct effect of bifurcation under § 506(a) is to reduce (sometimes drastically) the amount a secured creditor receives on its claim. Chapter 11 plans must propose to pay each secured claim in full in order to be confirmed over the secured claimant's objections. 11 U.S.C. § 1129(b)(2)(A)(i)(II). For a plan to pay less than 100 percent of unsecured claims, the Bankruptcy Code requires only that "the holder of any claim or interest that is junior to the claims of such class will not receive ... any property." 11 U.S.C. § 1129(b)(2)(B)(ii). In Airadigm's case, bifurcation would result in the FCC's

---

7. Section 506(a)(1) provides in full: "An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to set off is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1) (2006).

receiving payment for the roughly half of its total allowed claim which is deemed secured. The 2006 plan proposes to pay nearly nothing to the class of claims containing the FCC's unsecured claim.

Having previously valued the licenses which are the collateral for the FCC debt at a total of $33,009,164.00, I now find that to be the FCC's allowed secured claim in the present case. The remainder of the FCC's claim is allowed, but unsecured.

## VII. FCC COUNTERCLAIMS

■ To avoid the result of having its claim bifurcated, the FCC argues that federal law requires holders of PCS spectrum licenses to pay their debt in full or surrender the licenses:

> The payment obligations are not merely contractual payment terms to satisfy a commercial debt which can be subject to the avoidance powers. Rather, the obligations are part of a comprehensive scheme that governs all aspects of the Licenses and attempts to balance the various goals Congress established in the Communications Act. See 47 U.S.C. § 309(j).

Def. Mem. in Supp. at 38. The FCC backs up its point from many angles. It argues that *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), requires Airadigm to comply fully with FCC regulations (including the payment term) if it retains the licenses. It argues that at federal law, which determines the scope of a licensee's interest in spectrum licenses, the payment condition is inextricably bound up with the other rights conveyed by the licenses. It argues that under *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983) and *Hyde v. Woods*, 94 U.S. 523, 24 L.Ed. 264 (1876), the Bankruptcy Code

defers to the FCC's designation of the payment conditions as part of the rights conveyed by the licenses. Finally, as a matter of policy the FCC repeats its assertion that bifurcation of its lien would undermine the carefully crafted federal regulatory scheme of competitive bidding for spectrum licenses. *See* Def. Mem. in Supp. at 38.

The FCC's lines of attack do not require individual discussion because they all rely heavily on the assumption that the payment condition is part of the FCC's regulatory function. The Supreme Court's decision in *NextWave* says otherwise. *NextWave* held that § 525(a) of the Bankruptcy Code prohibited the FCC from canceling a debtor's PCS spectrum licenses "solely because such bankrupt or debtor ... has not paid a debt that is dischargeable in the case under this title." 537 U.S. at 302, 123 S.Ct. 832; *see* 11 U.S.C. § 525(a) (2006).

The FCC argued before the Supreme Court that "regulatory conditions like the full and timely payment condition are not properly classified as debts." *See NextWave*, 537 U.S. at 302, 123 S.Ct. 832. The Supreme Court responded in an 8–1 decision that since " 'claim' has the broadest available definition, and ... the plain meaning of a 'right to payment' is nothing more nor less than an enforceable obligation, regardless of the objectives the State seeks to serve in imposing the obligation, ... a debt is a debt, even when the obligation to pay it is also a regulatory condition." *Id.* at 303, 123 S.Ct. 832 (internal marks and citations omitted). As to the FCC's concern that preempting its regulations would undermine the competitive bidding system, the Court wrote:

> What petitioners describe as a conflict boils down to nothing more than a policy

preference on the FCC's part for (1) selling licenses on credit and (2) canceling licenses rather than asserting security interests in licenses when there is a default. Such administrative preferences cannot be the basis for denying respondent rights provided by the plain terms of a law.

*Id.* at 304, 123 S.Ct. 832.

The Supreme Court's unambiguous interpretation of the words "claim" and "debt" is binding on this court. Section 506(a)(1) governs the treatment of secured claims. It instructs bankruptcy courts to determine the value of collateral, set the amount of the allowed secured claim at that value, and treat the remainder of the allowed claim as unsecured. According to the Supreme Court, the FCC's payment condition must be treated as a claim. *Id.* Absent compelling authority to the contrary, I cannot allow the FCC's policy to conflict with the express terms of the Bankruptcy Code. In short, the Supreme Court was presented with the same argument that the FCC makes here, under a different section of the Bankruptcy Code. That reasoning applies under the section we are considering as well.

## VIII.

On the findings of fact and conclusions of law contained in this memorandum decision an order may be entered granting summary judgment as follows:

1. The FCC's motion for summary judgment on Count I of Airadigm's complaint is GRANTED.

2. The FCC's motion for summary judgment on Count II of Airadigm's complaint is GRANTED.

3. Airadigm's motion for summary judgment on Count I of the FCC's counterclaims is GRANTED. The FCC's allowed secured claim is $33,009,164.00.

4. The FCC's motion for summary judgment on Count II of the FCC's counterclaims is GRANTED IN PART, to the extent that the FCC has valid and enforceable security interests in the licenses. A declaratory judgment to that effect shall issue.

5. Airadigm's motion for summary judgment on Count II of the FCC's counterclaims is GRANTED IN PART, to the extent that Airadigm's obligation to timely pay the FCC in full is a debt under the Bankruptcy Code and therefore subject to bifurcation under 11 U.S.C. § 506(a). A declaratory judgment to that effect shall issue.

To the extent that any motion was not explicitly granted in paragraphs 1–6 above, it is hereby DENIED. No material issue remains for trial.

## ORDER

On the findings of fact and conclusions of law contained in the memorandum decision filed this date, it is hereby OR-DERED:

1. The FCC's motion for summary judgment on Count I of Airadigm's complaint is GRANTED.

2. The FCC's motion for summary judgment on Count II of Airadigm's complaint is GRANTED.

3. Airadigm's motion for summary judgment on Count I of the FCC's counterclaims is GRANTED. The FCC's allowed secured claim is $33,009,164.00.

4. The FCC's motion for summary judgment on Count II of the FCC's

counterclaims is GRANTED IN PART, to the extent that the FCC has valid and enforceable security interests in the licenses.

5. Airadigm's motion for summary judgment on Count II of the FCC's counterclaims is GRANTED IN PART, to the extent that Airadigm's obligation to timely pay the FCC in full is a debt under the Bankruptcy Code and therefore subject to bifurcation under 11 U.S.C. § 506(a).

6. To the extent that any motion was not explicitly granted in paragraphs 1–6 above, it is DENIED.

No material issue remains for trial.