# United States Court of Appeals
## For the First Circuit

No. 09-1922

MUSEUM OF FINE ARTS, BOSTON,

Plaintiff, Appellee,

v.

CLAUDIA SEGER-THOMSCHITZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel,  U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and Barbadoro,* District Judge.

Thomas J. Hamilton, with whom J. Owen Todd, David H. Rich, and
Todd & Weld LLP were on brief, for appellant.
Simon J. Frankel, with whom Theodore P. Metzler, Covington &
Burling LLP, Robert J. Muldoon, Jr., Thomas Paul Gorman, and Sherin
& Lodgen LLP were on brief, for appellee.

October 14, 2010

---

* Of the District of New Hampshire, sitting by designation.

**LIPEZ**, <u>Circuit Judge</u>. Claudia Seger-Thomschitz, the sole surviving heir of Austrian-Jewish art collector Oskar Reichel, seeks to recover possession of Oskar Kokoschka's <u>Two Nudes (Lovers)</u> ("the Painting"), a valuable oil painting formerly owned by Reichel and now held by the Museum of Fine Arts, Boston ("the MFA"). Seger-Thomschitz alleges that Reichel was forced to sell the Painting under duress after Austria was annexed by Nazi Germany in 1938 and that good title never passed to the original purchaser or to the MFA. The MFA counters that the original transaction was valid and that Seger-Thomschitz's claim to the Painting is time-barred in any event.

After private negotiations between Seger-Thomschitz and the MFA proved fruitless, the MFA commenced this action for a declaratory judgment to "confirm its rightful ownership of the painting." The district court granted summary judgment for the MFA on statute of limitations grounds, holding that Seger-Thomschitz's claims were time-barred. Having carefully reviewed the record, we now affirm that statute of limitations ruling.

**I.**

Oskar Reichel was a successful physician and art collector in Vienna during the first decades of the twentieth century. Before World War I, Dr. Reichel came to know Oskar Kokoschka, the celebrated Austrian expressionist, and became an early patron and collector of Kokoschka's work. Dr. Reichel

-2-

acquired a number of Kokoschka paintings during that period, including Two Nudes (Lovers), which he purchased from Kokoschka in 1914 or 1915. The Painting is a self-portrait of the artist in an embrace with Viennese socialite (and widow of composer Gustav Mahler) Alma Mahler, with whom Kokoschka was having a tempestuous affair at the time. The MFA describes the Painting as "large and striking," measuring more than three feet wide and five feet tall.

During the interwar period, Dr. Reichel lent the Painting on three occasions to Otto Kallir,[1] the proprietor of the Neue Gallery in Vienna, for display and possible sale. Dr. Reichel and Kallir agreed to a sale price for the Painting on at least two of those occasions: $1,800 U.S. dollars (gross) in 1924 and 4,000 Austrian schillings (net to Dr. Reichel) in 1933.[2] Although Dr. Reichel was able to sell six of his eleven Kokoschka works between the wars, he never sold the Painting, which remained in his possession until 1939 along with four other Kokoschka works.

Conditions for Dr. Reichel and other Austrian Jews rapidly deteriorated following the Anschluss -- the annexation of Austria by the Third Reich in March 1938. Pursuant to Nazi regulations, Dr. Reichel was forced to file a declaration in June

---

[1]    At the time, Kallir was known professionally as Otto Nirenstein or Otto Kallir-Nirenstein. He legally changed his name to Kallir in 1933.

[2]    The parties have not attempted to convert the various currencies noted in the opinion to present day dollars. We simply report the sums as they appear in the record.

1938 listing all of the valuable property he owned. One expert witness described the declaration as a "prelude to the formal Nazi confiscation and seizure of all Jewish-owned property in Austria and Germany." Proceeds from the sale of declared property had to be deposited into a Nazi-controlled account and could be withdrawn only in limited amounts. In his 1938 property declaration, Dr. Reichel stated that he owned the Painting and four other Kokoschka works. He declared the combined value of the Painting and another work to be 250 Reichsmark.

Around the same time, Kallir, who was also Jewish, transferred ownership of his gallery to his non-Jewish secretary and moved to Paris. While Kallir was in Paris, Dr. Reichel agreed to transfer his remaining five Kokoschka works, including the Painting, to Kallir. The details of this transaction are sketchy. It is not clear whether Dr. Reichel received any consideration for the works at the time. Two contemporaneous notes indicate that Kallir agreed to purchase the five paintings for a total of 800 Swiss francs. However, Dr. Reichel's son Raimund later said that his father arranged for Kallir to send the proceeds of the transaction to another son, Hans, who had already immigrated to the United States. According to Raimund, Kallir sent Hans $250 for the five paintings in 1940 or 1941, and Hans forwarded half that sum to Raimund. The five Kokoschkas, including the Painting, were

transferred from Dr. Reichel to a shipping company in Vienna, then exported to Paris.

Dr. Reichel and his wife Malvine suffered at the hands of the Nazis. They were forced to close the business Dr. Reichel had founded and to give up their family home and another property. Their eldest son was deported to Lodz, Poland, where he was killed. Malvine was sent to the Theresienstadt concentration camp in 1943, and Dr. Reichel died of natural causes that same year. The two younger sons had emigrated by that time -- Hans to the United States and Raimund to Argentina. Malvine survived the war and eventually joined Hans in the United States.

Meanwhile, Kallir had settled in New York, where he opened the Galerie St. Etienne. He brought the Painting with him and sold it to the Nierendorf Gallery for $1,500 in 1945. The Nierendorf Gallery then sold the Painting to the E.A. Silberman Galleries, which in turn sold the Painting to Sarah Reed Blodgett in 1947 or 1948. Blodgett kept the painting for many years, lending it out for exhibitions from time to time. She eventually bequeathed the Painting to the MFA, which acquired possession in 1973.[3] The Painting has been on almost continuous display at the

---

[3] Blodgett bequeathed another Kokoschka painting, Portrait of a Youth -- which depicts Hans Reichel as a boy -- to her daughter. Seger-Thomschitz claimed ownership of that painting as well, but the U.S. District Court for the Eastern District of Louisiana found that Blodgett's daughter had acquired title through acquisitive prescription (a civil law doctrine analogous to adverse possession) and that Seger-Thomschitz's claims were time-barred in

MFA since then, though it has been loaned out many times for exhibitions in the United States and around the world.

Raimund moved back to Vienna in 1982. He executed a will in 1989, in which he designated Seger-Thomschitz as his sole heir. It is not clear how Raimund and Seger-Thomschitz knew each other. She is described in one document as his "select-niece," but they are not blood relatives. When Raimund died in 1997, Seger-Thomschitz became the sole surviving heir of Dr. Reichel.[4]

Seger-Thomschitz says that she "first learned that the Nazis confiscated artworks from Oskar Reichel in the Fall of 2003 when the Museums of Vienna contacted her concerning their intent to return to her as the sole heir of Oskar Reichel four artworks in their collection by the artist Anton Romako . . . ." The restitution of the Romako works was pursuant to a municipal resolution that Vienna had passed in 1999, which in turn implemented a 1998 national art restitution law. One municipal document notes that "it seemed quite proper" to return the works to Seger-Thomschitz because Dr. Reichel "had to sell [them] due to his persecution as a Jew." Notably, Dr. Reichel appears to have sold

_____

any event. See Dunbar v. Seger-Thomschitz, 638 F. Supp. 2d 659, 663-64 (E.D. La. 2009). The Fifth Circuit recently affirmed that decision. See Dunbar v. Seger-Thomschitz, No. 09-30717, 2010 WL 3292678 (5th Cir. Aug. 20, 2010).

[4] Hans died in 1979. His will designated Raimund as his sole heir.

the Romako works around the same time that he sold the Painting, and under similar circumstances. He sold three of the four Romakos to the Neue Gallery in 1939 "for only small equivalent amounts," and he sold the fourth to the Neue Gallery in 1942. The gallery, by then under the direction of Otto Kallir's former secretary, subsequently sold the Romakos to the city.

Following her correspondence with the Museums of Vienna, Seger-Thomschitz retained a Viennese attorney, Erich Unterer -- who had also been Raimund Reichel's attorney -- "for purposes of handling the restitution of any artworks that Oskar Reichel may have lost due to Nazi persecution." Seger-Thomschitz and Unterer initially thought that all of the artwork Dr. Reichel lost during the Nazi era had been returned. In 2006, however, an American attorney "began a colloquy" with Seger-Thomschitz and alerted her to the possibility that other works formerly owned by Dr. Reichel might be located outside Austria. Seger-Thomschitz retained the attorney, whose firm then sent a letter to the MFA on March 12, 2007, demanding the return of the Painting.

When confronted with Seger-Thomschitz's claim to the Painting, the MFA undertook "an exhaustive effort to research and document the provenance of the Painting in order to ascertain whether the claim . . . appeared valid or not." An MFA curator and an independent provenance researcher spent eighteen months researching the Painting's history, during which time they visited

-7-

approximately ten museums and governmental archives around the world and corresponded with numerous other museums and archives. Based on that research, the MFA concluded that the original transfer of the Painting from Dr. Reichel to Kallir was valid and that it would retain the Painting in its collection. It commenced an action against Seger-Thomschitz in the United States District Court for the District of Massachusetts on January 22, 2008, seeking a declaratory judgment to "confirm its rightful ownership of the painting." Seger-Thomschitz answered the complaint in May of that same year and asserted counterclaims for conversion, replevin, and other state law causes of action.

In September 2008, the MFA filed a motion for summary judgment arguing that all of Seger-Thomschitz's counterclaims were time-barred as a matter of law. Seger-Thomschitz opposed the motion for summary judgment and also filed a motion to amend her answer to add a theory of fraudulent concealment (which might have extended the limitations period, see Mass. Gen. Laws ch. 260, § 12) and an accompanying affidavit requesting the postponement of summary judgment proceedings so that she could have extra time to conduct discovery on the fraudulent concealment theory, see Fed. R. Civ. P. 56(f).

The district court granted the motion for summary judgment and denied the motion to amend. See Museum of Fine Arts, Boston v. Seger-Thomschitz, No. 08-10097, 2009 WL 6506658 (D. Mass.

June 12, 2009).  Applying the three-year Massachusetts statute of limitations applicable to tort and replevin actions, Mass. Gen. Laws ch. 260, § 2A, the district court held that the causes of action against the MFA accrued when the Reichel family and/or Seger-Thomschitz discovered or should reasonably have discovered the basis for their claims to the Painting.  Museum of Fine Arts, 2009 WL 6506658 at *7.  It then addressed both the Reichel family's knowledge and Seger-Thomschitz's knowledge, concluding that all parties should have known about the basis for their claims more than three years before Seger-Thomschitz made her demand on the MFA through her attorney's letter.  It also denied the motion to amend. Judgment was entered in favor of the MFA,[5] and this appeal followed.

## II.

Only a narrow range of issues is presented on appeal. Because the district court proceedings ended with summary judgment on statute of limitations grounds, we are not asked to judge the validity of the original transfer of the Painting from Dr. Reichel to Kallir.  On this record, given the passage of time, the validity of the transfer "is not clear-cut."[6]  See id. at *6.  The question

---

[5]    The judgment reads, in relevant part: "IT IS ORDERED AND ADJUDGED that Defendant Dr. Claudia Seger-Thomschitz does not have a valid claim to the painting Two Nudes (Lovers) by Oskar Kokoschka because any claim by defendant to that painting is time-barred."

[6]    One commentator explains that "[s]orting the legitimate transaction from the illegitimate sixty or seventy years later can

-9-

we face, however, is whether Seger-Thomschitz's counterclaims, meritorious or not, are time-barred as a matter of law.

The limitations question, in turn, has generated two separate strands of argument in this litigation. The dominant strand in the district court proceedings, and the one the MFA now focuses on, concerns the accrual of Seger-Thomschitz's causes of action under Massachusetts law. The district court held that the claims accrued "decades before the filing of this lawsuit," and in any event no later than the fall of 2003, when Seger-Thomschitz was apprised of Vienna's decision to return the Romako works. Museum

---

be extremely difficult":

> Much art was Aryanized, or subjected to forced sales for prices significantly below market value (if any value ever actually materialized for the seller), and some art was sold at infamous "Jew auctions," which are now universally recognized as illegal. But some sales before April 26, 1938, were legitimate and for fair market value or close thereto. Some people were able to voluntarily sell art on the open market, albeit not much modern art after Hitler declared it "degenerate". Additionally, because so many Jews were compelled to forfeit "flight asset[s]" to pay for their passage out of the Reich, the European art market reflected depressed prices.

Jennifer Anglim Kreder, The New Battleground of Museum Ethics and Holocaust-Era Claims: Technicalities Trumping Justice or Responsible Stewardship for the Public Trust?, 88 Or. L. Rev. 37, 49-50 (2009). Cf. Schoeps v. Museum of Modern Art, 594 F. Supp. 2d 461, 466 (S.D.N.Y. 2009) (holding, on facts similar to those presented here, that a triable issue existed as to whether the original transfer was voluntary under German law); Bakalar v. Vavra, No. 08-5119, 2010 WL 3435375, at *10-15 (2d Cir. Sept. 2, 2010) (Korman, J., separately concurring) (discussing some of the relevant legal considerations under New York law).

of Fine Arts, 2009 WL 6506658, at *8-9. Seger-Thomschitz argues that there is a triable issue as to when she and/or the Reichels were on notice of the basis for the claims, and she complains that the district court should have allowed her more time to conduct discovery. She also contends that even if the district court correctly applied the Massachusetts discovery rule, the circumstances of this case justify displacing the Massachusetts limitations period with a federal common law laches defense. We address each of these arguments in turn.

## A. Massachusetts Discovery Rule

The district court and the parties have limited the breadth of the statute of limitations inquiry in three important ways. First, the district court held that the law of Massachusetts, rather than the law of Austria, New York, or some other jurisdiction, governs both the merits of Seger-Thomschitz's counterclaims and the limitations period applicable to those claims. The parties do not contest that determination on appeal. Second, the district court held that, under Massachusetts law, Seger-Thomschitz's counterclaims are governed by the three-year limitations period applicable to tort and replevin actions, Mass. Gen. Laws ch. 260, § 2A. Although Seger-Thomschitz argued below that the six-year period applicable to contract claims should apply, she has abandoned that position on appeal and so has conceded that the three-year period applies.

-11-

Third, under the applicable statute of limitations, "actions of tort, actions of contract to recover for personal injuries, and actions of replevin, shall be commenced only within three years next after the cause of action accrues." Mass. Gen. Laws ch. 260, § 2A. The district court analyzed the accrual question by applying the so-called discovery rule, which provides that "a cause of action accrues when 'an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused her injury.'" Donovan v. Philip Morris USA, Inc., 914 N.E.2d 891, 903 (Mass. 2009) (quoting Bowen v. Eli Lilly & Co., 557 N.E.2d 739, 741 (Mass. 1990)). Although the discovery rule is not the only possible way of measuring accrual in a missing art case,[7] the parties do not contest the

---

[7] A number of alternative approaches are noted in Ashton Hawkins et al., A Tale of Two Innocents: Creating an Equitable Balance Between the Rights of Former Owners and Good Faith Purchasers of Stolen Art, 64 Fordham L. Rev. 49, 77 & nn. 174-75 (1995), and Steven A. Bibas, Note, The Case Against Statutes of Limitations for Stolen Art, 103 Yale L.J. 2437, 2440-48 (1994). They include variations on the doctrine of adverse possession, rules tying accrual to the date the possessor acquired the property, and the rule that a cause of action for conversion against an innocent purchaser does not accrue until there has been a demand for, and a refusal to surrender, the property. New York explicitly follows the demand and refusal rule. See Solomon R. Guggenheim Found. v. Lubell, 569 N.E.2d 426, 429 (N.Y. 1991). The case law suggests that such a rule could potentially be applied in Massachusetts as well. See Atl. Fin. Corp. v. Galvam, 39 N.E.2d 951, 952 (Mass. 1942); In re Halmar Distribs., Inc., 968 F.2d 121, 129 (1st Cir. 1992); see also W. Page Keeton et al., Prosser and Keeton on Torts 93-94 (5th ed. 1984). Because Seger-Thomschitz's concession removes these issues from our consideration, we do not express any opinion on them.

district court's decision to apply it here. We therefore follow the district court's lead in applying the discovery rule to Seger-Thomschitz's counterclaims.

The party seeking the benefit of the discovery rule has the burden of showing (1) that she lacked actual knowledge of the basis for her claim and (2) that her lack of knowledge was objectively reasonable. Koe v. Mercer, 876 N.E.2d 831, 836 (Mass. 2007). Courts applying the discovery rule in missing art cases have tested the reasonableness of the claimant's lack of knowledge by asking whether the claimant "acted with due diligence in pursuing his or her personal property." O'Keeffe v. Snyder, 416 A.2d 862, 872 (N.J. 1980); accord Autocephalous Greek-Orthodox Church v. Goldberg & Feldman Fine Arts, Inc., 917 F.2d 278, 288-89 (7th Cir. 1990); Erisoty v. Rizik, No. 93-6215, 1995 WL 91406, at *10 (E.D. Pa. Feb. 23, 1995).

In contrast to many missing art cases, the location of the Painting has been no secret in this case. The Painting has long been on public display at the MFA, a major international museum. Since 2000, the MFA has listed the Painting in a provenance database on its publicly accessible website. Several published books and at least one catalogue raisonné of Kokoschka's works[8] identify the MFA as the current holder of the Painting.

---

[8] As the district court explained, a catalogue raisonné is a comprehensive scholarly listing of an artist's works. Museum of Fine Arts, 2009 WL 6506658, at *2 n.4.

-13-

Finally, the Getty Provenance Index, a database of provenance information that has been searchable on the internet since 1999, notes that the Painting is part of the MFA's collection. There is no question that the MFA's possession of the Painting has long been discoverable with minimal diligence.

Then there is the question of when the Reichel family should have known that Dr. Reichel formerly owned the Painting and gave it up under conditions that may have amounted to duress. The district court held that Hans, Raimund, and Malvine Reichel "had ample notice of any possible claim to the Painting decades before the filing of this lawsuit." Museum of Fine Arts, 2009 WL 6506658, at *8. Among other things, the district court noted that Raimund wrote several letters to art historians during the 1980s in which he indicated that he remembered the Painting and knew the details of its transfer to Kallir. See id. at *7-8. That knowledge, plus the fact that the Reichel family sought compensation for some artworks but not the Painting, led the district court to conclude that the family's failure to lay claim to the Painting was not due to ignorance about the availability of restitution. Id. at *7, 8 n.11.

There is also the separate question of Seger-Thomschitz's knowledge of the Painting, an issue somewhat obscured by her motion to amend her counterclaim. She sought leave to amend while the motion for summary judgment was pending in the district court,

-14-

alleging that Kallir fraudulently concealed the details of Dr. Reichel's sale of the Painting from the Reichel family. She also filed an affidavit in accordance with Federal Rule of Civil Procedure 56(f) asking for additional time to conduct discovery on the fraudulent concealment theory. The district court denied the motion, concluding that summary judgment was warranted even if the allegations of fraudulent concealment were true. See Museum of Fine Arts, 2009 WL 6506658, at *9-10.

As Seger-Thomschitz acknowledged at oral argument, there is no allegation that Kallir fraudulently concealed anything from her. Hence the fraudulent concealment claim does not affect the knowledge of Seger-Thomschitz herself, which the district court cited as an alternative basis for granting summary judgment. We focus our analysis on that ruling.

By her own admission, Seger-Thomschitz "learned that the Nazis had confiscated artworks from Oskar Reichel in the Fall of 2003 when the Museums of Vienna contacted her concerning their intent to return to her as the sole heir of Oskar Reichel four artworks in their collection by the artist Anton Romako." That information put her on notice that she might have a claim to other artworks that were previously owned by Dr. Reichel. She retained a Viennese attorney that same year "for purposes of handling the restitution of any artworks that Oskar Reichel may have lost due to Nazi persecution." Yet she did not demand the return of the

-15-

Painting from the MFA until March 12, 2007, well over three years after she was contacted about the Romakos.

As we have already noted, and as the district court explained more fully, provenance information for the Painting, including the fact of Dr. Reichel's prior ownership, was available on the MFA's website, in the Getty Provenance Index, in several catalogues raisonnés of Kokoschka's works, and in a book published in Vienna in 2003 that "included a picture of the Painting, traced its provenance from Reichel to the MFA, included a transcription of Reichel's April 1938 property declaration listing the Painting[,] and described the sale of the work to Kallir and its subsequent exhibition in the United States at the Galerie St. Etienne." Museum of Fine Arts, 2009 WL 6506658, at *9. In addition, Dr. Reichel's property declaration has been directly accessible to the public since 1998. Although the availability of some of these sources may not have been obvious to Seger-Thomschitz, who is a nurse with no specialized training in Nazi-era art claims, that fact does not excuse her delay. It was her burden under Massachusetts law to discover from the relevant professional communities whether she had a cognizable legal claim. Doe v. Harbor Sch., Inc., 843 N.E.2d 1058, 1067 n.13 (Mass. 2006). Indeed, she had an attorney available to her in 2003 who could have helped her discover the basis for her claim.

Seger-Thomschitz argues that "because the discovery rule is fact intensive, juries -- rather than the court -- should decide when plaintiffs knew or should have been aware of their claims." That argument does not get her far.  The issue of what a party knew or should have known is often a question of fact to be submitted to the jury.  Mercer, 876 N.E.2d at 836.  However, summary judgment may be granted on a limitations defense if there is no genuine dispute about the material facts, and the record evidence would not permit a reasonable jury to return a verdict for the nonmoving party.  See Genereux v. Am. Beryllia Corp., 577 F.3d 350, 361 (1st Cir. 2009); Doyle v. Shubs, 905 F.2d 1, 1 (1st Cir. 1990) (per curiam).  Cf. Mercer, 876 N.E.2d at 836 (applying a similar standard under Massachusetts Rule of Civil Procedure).  That is the case here.

Seger-Thomschitz did not submit her own affidavit to explain what she was doing between 2003 and 2007, a curious omission given that she is in the best position to account for that period.  Her American attorney, whom she retained in 2006, submitted an affidavit in connection with her Rule 56(f) request in which he stated that Seger-Thomschitz and her Austrian attorney "had come to believe that all of the artwork that Oskar Reichel lost due to Nazi persecution had remained in Vienna and had been restituted."  Of course, in light of all the publicly available information about the provenance of the Painting, a mistake of that

sort does not delay the commencement of the limitations period. Any reasonable jury confronted with the summary judgment record would conclude that Seger-Thomschitz's causes of action accrued no later than the fall of 2003, when she learned that the Nazis had confiscated artworks from Dr. Reichel, and could then, with reasonable diligence, have discovered her claim to the Painting. Because she did not make a demand on the MFA until March 12, 2007, more than three years after her causes of action accrued, summary judgment was properly granted on the MFA's limitations defense.

## B. Federal Preemption

Seger-Thomschitz argues in the alternative that the Massachusetts statute of limitations should not be applied at all. She contends that her case implicates important federal interests, and so should be governed by federal timeliness principles based in equity rather than the more rigid Massachusetts limitations period.

### 1. MFA's Tax-Exempt Status

In the district court and in her opening brief on appeal, Seger-Thomschitz focused much of her preemption argument on the MFA's status as a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). She argues that the application of a state limitations period in this case would frustrate the "many discrete and compelling federal interests that inhere when judicial claims to recover Nazi-confiscated artworks are brought against U.S. tax-exempt public trustees such

-18-

as the MFA." In lieu of the Massachusetts limitations period, she would have us apply the more flexible doctrine of laches as a matter of federal common law, thereby placing the burden on the MFA to prove the lack of diligence of a claimant such as Seger-Thomschitz and the prejudice experienced by the MFA because of Seger-Thomschitz's delay in asserting her claims.[9] The logic of her position would entail displacing state limitations periods in favor of a federal laches rule whenever a claim for restitution of a Nazi-era artwork was made against a tax-exempt organization.

The Supreme Court has warned that the judiciary should create special federal common law rules in "few and restricted" cases. O'Melveny & Myers v. FDIC, 512 U.S. 79, 87 (1994) (internal citations and quotation marks omitted). "'Whether latent federal power should be exercised to displace state law is primarily a decision for Congress,' not the federal courts." Atherton v. FDIC, 519 U.S. 213, 218 (1997) (quoting Wallis v. Pan Am. Petroleum Corp., 384 U.S. 63, 68 (1966)). To justify the application of a federal common law rule, the proponent must typically show that there is a "significant conflict between some federal policy or interest and the use of state law." Id. (internal quotation marks omitted).

---

[9] "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." Costello v. United States, 365 U.S. 265, 282 (1961).

-19-

Seger-Thomschitz contends that the federal government has a compelling interest in "ensuring that charitable organizations that operate as tax exempt entities provide the public with the benefits for which their tax exemptions were granted." Tax-exempt museums, in her view, have "undermine[d] the rationale for their tax exemptions" by consistently failing to investigate the provenance of the artworks they acquire, thereby facilitating commerce in stolen artworks and other contraband. Without further elaboration, she concludes, "Federal courts therefore are empowered to formulate appropriate rules of accrual in lawsuits seeking to reclaim Nazi-confiscated artworks in the possession of U.S. tax-exempt museums that will encourage these museums to operate lawfully."

On this record, Seger-Thomschitz's argument asks too much of the federal courts and the federal tax code. Tax-exempt organizations, no less than non-exempt organizations, are already subject to applicable state law. See, e.g., Abramian v. President & Fellows of Harvard Coll., 731 N.E.2d 1075 (Mass. 2000) (upholding judgment against tax-exempt university under state employment law). Indeed, as the MFA notes, its trustees are subject to common law fiduciary duties relevant to the accusations of wrongdoing that Seger-Thomschitz has made in this case. The principal distinguishing characteristic of a section 501(c)(3) organization is that, by "legislative grace," it is not required to pay federal

-20-

taxes on its income.[10]  IHC Health Plans, Inc. v. Comm'r, 325 F.3d 1188, 1193-94 (10th Cir. 2003) (internal quotation marks omitted).

Although 501(c)(3) status is conditioned on the organization's adherence to certain federally prescribed standards, see Bob Jones Univ. v. United States, 461 U.S. 574, 592 (1983), these standards do not justify a free-ranging superintendence by the federal courts.  If a 501(c)(3) organization fails to meet its obligations under the tax code, the law provides a remedy: the organization's tax-exempt status can be revoked.  See Rev. Proc. 2010-9, 2010-2 I.R.B. 258; Branch Ministries v. Rossotti, 211 F.3d 137, 141-42 (D.C. Cir. 2000).  In addition, egregious abusers of section 501(c)(3) may be subject to civil or criminal penalties.  See, e.g., United States v. Fumo, 628 F. Supp. 2d 573, 593-95 (E.D. Pa. 2007).  The federal interest in ensuring that tax-exempt organizations "demonstrably serve and be in harmony with the public interest," Bob Jones Univ., 461 U.S. at 592, is adequately protected through these mechanisms and others.  We perceive no need to create additional federal common law rules to punish and deter bad behavior by tax-exempt organizations, as Seger-Thomschitz proposes.

In sum, Seger-Thomschitz has not shown that application of the Massachusetts statute of limitations to the Massachusetts

---

[10]    An important collateral benefit is that donations to a 501(c)(3) organization are tax-deductible.  See Bob Jones Univ. v. Simon, 416 U.S. 725, 727-28 (1974).

causes of action in this case would cause a "significant conflict with, or threat to," the federal interests and policies embodied in section 501(c)(3).  <u>Atherton</u>, 519 U.S. at 225.  We therefore decline her invitation to replace, on that basis, the Massachusetts limitations period with a federal common law laches defense.

## 2.  **Foreign Affairs Preemption**

Seger-Thomschitz also argues that the Massachusetts statute of limitations should be set aside because it conflicts with the federal government's foreign policy.[11]  She grounds her argument in a federal statute and several international declarations signed by the executive branch that touch on the subject of Nazi-confiscated art.  She correctly recognizes that the statute and the declarations are merely hortatory, and so do not create any substantive legal rules capable of directly preempting state law.  <u>See</u> <u>Hawaii</u> v. <u>Office of Hawaiian Affairs</u>, 129 S. Ct. 1436, 1443 (2009).  Nevertheless, she argues that they constitute evidence of a federal policy disfavoring the application of rigid limitations periods to claims for Nazi-looted artwork.  That federal policy, she contends, is itself capable of preempting the Massachusetts statute of limitations.

---

[11]    The MFA contends that Seger-Thomschitz's foreign affairs preemption argument is forfeited because it was raised for the first time in her reply brief.  That is not correct.  Seger-Thomschitz specifically argued for foreign affairs preemption in her opening brief.  She then developed that argument further in her reply brief.  There was no forfeiture.

In support of her argument, Seger-Thomschitz relies on American Insurance Association v. Garamendi, 539 U.S. 396 (2003). The Supreme Court held in Garamendi that "state law must give way" when it is in "clear conflict" with an "express federal policy" in the foreign affairs context. 539 U.S. at 421, 425. At issue was California's Holocaust Victim Insurance Relief Act (HVIRA), a law that required insurance companies doing business in the state to disclose information about policies sold in Europe during the Nazi era. Id. at 401. A group of insurers challenged the law on the ground that it interfered with the President's policy, expressed in executive agreements and statements by executive branch officials, encouraging voluntary settlement of Nazi-era insurance claims through the auspices of the International Commission on Holocaust Era Insurance Claims. Id. at 413, 421. The Supreme Court agreed, concluding that California's aggressive disclosure requirements were an "obstacle to the success of the National Government's chosen 'calibration of force' in dealing with the Europeans using a voluntary approach." Id. at 425 (citation omitted). The Court held that the "clear conflict" between the state statute and an "express federal policy" was sufficient to justify preemption. Id. It added:

> If any doubt about the clarity of the conflict remained, however, it would have to be resolved in the National Government's favor, given the weakness of the State's interest, against the backdrop of traditional state legislative subject matter, in regulating

-23-

> disclosure of European Holocaust-era insurance
> policies in the manner of HVIRA.

Id.

We conclude that Garamendi is inapposite for two reasons.[12] First, there is no comparably express federal policy bearing on the issues in this case. Second, even if there were such a policy, the Massachusetts statute of limitations would not be in clear conflict with it.

As evidence of an express federal policy disfavoring the application of limitations periods to claims for Nazi-looted artwork, Seger-Thomschitz directs our attention to four sources of law: the Holocaust Victims Redress Act of 1998, the Washington Conference Principles on Nazi-Confiscated Art, the Vilnius Forum Declaration, and the Terezín Declaration on Holocaust Era Assets and Related Issues.[13] The Holocaust Victims Redress Act is a

---

[12] We recognize that the Supreme Court's decision in Medellín v. Texas, 552 U.S. 491 (2008), may have cast doubt on the continuing vitality of Garamendi. See, e.g., A. Mark Weisburd, Medellín, the President's Foreign Affairs Power and Domestic Law, 28 Penn St. Int'l L. Rev. 595, 625 (2010) ("One fairly clear consequence of Medellín is that the very broad language used in American Ins. Ass'n v. Garamendi no longer carries weight." (footnote omitted)). But see In re Assicurazioni Generali, S.P.A., 592 F.3d 113, 119 n.2 (2d Cir. 2010) (concluding that Medellín is consistent with a broad understanding of Garamendi); Movsesian v. Victoria Versicherung AG, 578 F.3d 1052, 1059 (9th Cir. 2009) (acknowledging Medellín but nonetheless applying Garamendi broadly). We express no opinion on that issue. Even if the Garamendi doctrine retains its full force, it does not aid Seger-Thomschitz in this case.

[13] Seger-Thomschitz also relies on what she characterizes as "statements of high ranking U.S. officials." However, the first

-24-

federal statute, and the other three documents are executive agreements -- international declarations signed by the executive branch on behalf of the United States, but not approved by the Senate (as treaties) or by the entire Congress (as congressional-executive agreements).

The four documents are, for the most part, phrased in general terms evincing no particular hostility toward generally applicable statutes of limitations. The Holocaust Victims Redress Act, for example, merely expresses the "sense of the Congress" that "all governments should undertake good faith efforts to facilitate the return" of Nazi-confiscated property. Pub. L. No. 105-158, § 202, 112 Stat. 15, 17-18 (1998). Similarly, the Washington Principles state that when Nazi-confiscated artwork is identified, "steps should be taken expeditiously to achieve a just and fair solution, recognizing this may vary according to the facts and circumstances surrounding a specific case." U.S. Dep't of State, The Washington Conference on Holocaust Era Assets, Washington Conference Principles on Nazi-Confiscated Art (Dec. 3, 1998),

---

statement -- remarks by former Ambassador Stuart Eisenstadt at the Prague Holocaust Era Assets Conference -- was delivered in the speaker's personal capacity and so does not represent the position of the executive branch. The second statement -- remarks by Ambassador J. Christian Kennedy at the State Department in 2009 -- was stricken from the record for procedural reasons and is not otherwise publicly available. Neither statement can be used to support Seger-Thomschitz's preemption argument, and she has not directed our attention to any other statements of executive branch policy akin to the official letters and testimony that the Supreme Court considered in Garamendi.

http://www.state.gov/www/regions/eur/holocaust/heacappen.pdf. The Vilnius Forum Declaration "asks all governments to undertake every reasonable effort to achieve the restitution of cultural assets looted during the Holocaust" and recognizes that "solutions may vary according to the differing legal systems among countries and the circumstances surrounding a specific case." Vilnius International Forum on Holocaust-Era Looted Cultural Assets, Vilnius Forum Declaration (Oct. 5, 2000), <u>available</u> <u>at</u> http://www.lootedartcommission.com/vilnius-forum. We discern no express federal policy disfavoring statutes of limitations in the general language of those documents.

The Terezín Declaration is more on point. The parties to the Declaration stated, in relevant part:

> [W]e urge all stakeholders to ensure that their legal systems or alternative processes, while taking into account the different legal traditions, facilitate just and fair solutions with regard to Nazi-confiscated and looted art, and to make certain that claims to recover such art are resolved expeditiously and based on the facts and merits of the claims and all the relevant documents submitted by all parties. Governments should consider all relevant issues when applying various legal provisions that may impede the restitution of art and cultural property, in order to achieve just and fair solutions, as well as alternative dispute resolution, where appropriate under law.

Prague Holocaust Era Assets Conference, Terezín Declaration (June 30, 2009), http://www.holocausteraassets.eu/program/conference-proceedings/declarations. This statement reflects a clear

-26-

preference that Nazi-era art disputes should be resolved "based on the facts and the merits" rather than on legal technicalities. Nevertheless, the language is too general and too hedged to be used as evidence of an express federal policy disfavoring statutes of limitations. A preference for the resolution of claims on the merits does not mean that all time limitations should be abandoned. Moreover, the Terezín Declaration recognizes that "various legal provisions that may impede the restitution of art and cultural property" will continue to be applied. The proposed solution is for governments applying such provisions to "consider all relevant issues . . . in order to achieve just and fair solutions." None of this language is sufficiently clear and definite to constitute evidence of an express federal policy against the applicability of state statutes of limitations to claims for the recovery of lost, stolen, or confiscated art.

Even if there were an express federal policy disfavoring overly rigid timeliness requirements, the Massachusetts statute of limitations would not be in "clear conflict" with that policy. The Supreme Court indicated in Garamendi that it is appropriate to "consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted." 539 U.S. at 420. The enactment of generally applicable statutes of limitations is a traditional state prerogative, and states have a substantial

-27-

interest in preventing their laws from being used to pursue stale claims. In that sense, the statute in this case is unlike the law in Garamendi, which "effectively single[d] out only policies issued by European companies, in Europe, to European residents, at least 55 years ago." Id. at 425-26 (distinguishing HVIRA from a "generally applicable 'blue sky' law").

Moreover, as our earlier discussion makes clear, the Massachusetts statute of limitations, as tempered by the discovery rule, is flexible and sensitive to the facts of each case. It strikes a reasonable balance between restitution and repose, permitting a claimant who has diligently pursued her rights to have her day in court. Indeed, because a claimant in a missing or confiscated art case may be able to defeat summary judgment by demonstrating that she diligently pursued her property, the Massachusetts discovery rule may not be that different in practice from the federal common law laches defense that Seger-Thomschitz would like us to apply. The Massachusetts statute of limitations is not preempted under Garamendi. Accord Dunbar v. Seger-Thomschitz, No. 09-30717, 2010 WL 3292678, at *4 (5th Cir. Aug. 20, 2010) (rejecting a similar argument).

**III.**

Statute of limitations defenses, even when tempered by a discovery rule, may preclude otherwise meritorious claims. Inescapably, statutes of limitations are somewhat arbitrary in

-28-

their choice of a particular time period for asserting a claim. Yet statutes of limitations cannot be fairly characterized as technicalities, and they serve important interests:

> Statutes of limitations, which are found and approved in all systems of enlightened jurisprudence, represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that the right to be free of stale claims in time comes to prevail over the right to prosecute them. These enactments are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

United States v. Kubrick, 444 U.S. 111, 117 (1979) (internal quotation marks and citations omitted).

Precisely because they do not address the merits of a claim, statutes of limitations do not vindicate the conduct of parties who successfully invoke them. Although we make no judgment about the legality of the MFA's acquisition of the Painting in 1973, we note the MFA's own disclosure that, when confronted with Seger-Thomschitz's claim, it initiated a provenance investigation for the Painting that it had not done before. The timing of that investigation may have been legally inconsequential in this case. However, for works of art with unmistakable roots in the Holocaust era, museums would now be well-advised to follow the guidelines of

-29-

the American Association of Museums: "[M]useums should take all reasonable steps to resolve the Nazi-era provenance status of objects before acquiring them for their collections -- whether by purchase, gift, bequest, or exchange."  American Association of Museums, Guidelines Concerning the Unlawful Appropriation of Objects During the Nazi Era (Nov. 1999), http://www.aam-us.org/museumresources/ethics/nazi_guidelines.cfm .

**AFFIRMED**.